673 A.2d 744

**Shawna BARBER**

v.

**EASTERN KARTING CO. et al.**

**No. 784, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

March 28, 1996.

Michael K. Madden (Michael G. Carey and Whitman, Breed, Abbott & Morgan, on the brief), Washington, DC, for Appellant.

Jodi K. Ebersole (Robert L. Ferguson, Jr. and Ferguson, Schetelich, Heffernan & Murdock, on the brief, for appellee, Woodbridge Karters, Inc.), Baltimore, Timothy J. Mulreany (John A. Rego, Francis X. Quinn, John T. Horton and Bourbon & Horton, on the brief, for appellees, Eastern Karting and Margay Racing Products, Inc.), Rockville, for Appellees.

Argued before CATHELL, DAVIS and HARRELL, JJ.

DAVIS, Judge.

Shawna Barber appeals from two orders of the Circuit Court for Anne Arundel County granting summary judgment in favor of appellees Woodbridge Karters, Inc. (Woodbridge), Margay Racing Products, Inc. (Margay), and Eastern Karting

Company (Eastern). Several questions are presented on this appeal; we restate them as follows:

I. Did the circuit court err in granting summary judgment in favor of Margay and Eastern on the ground that the anticipatory release fully released Margay and Eastern of appellant's strict product liability claims?

II. Did the circuit court err in granting summary judgment in favor of Woodbridge, Margay, and Eastern based on the anticipatory release, because: (1) the anticipatory release allegedly was not intended to apply to claims for injuries not ordinarily associated with go-kart racing; and (2) the terms of the anticipatory release were allegedly not made clear to appellant?

III. Did the circuit court err in granting summary judgment in favor of Woodbridge based on the anticipatory release because the evidence on the record purportedly establishes a genuine dispute as to whether appellant fully intended to release Woodbridge from liability based on Woodbridge's allegedly reckless conduct?

IV. Did the circuit court err in granting summary judgment in favor of Margay and Eastern on the ground that appellant assumed the risk of her injury?

V. Did the circuit court err in granting summary judgment in favor of Margay and Eastern on the ground that appellant was contributorily negligent?

To all but the third question, we respond in the affirmative. As a result of the disposition of the questions presented, we remand this case to the circuit court for further proceedings consistent with this opinion.

## . FACTS

On September 18, 1993, appellant suffered an extremely serious injury when her hair became entangled in the rear axle of a high-performance go-kart that she was driving during a go-kart racing event organized and sponsored by

Woodbridge. Woodbridge, a not-for-profit corporation, operates a go-kart racing club that organizes and sanctions go-kart racing competitions.

Appellant was driving an "Enduro" go-kart manufactured by Margay and sold by Eastern to Cort Kane, an experienced go-kart racer. Kane was appellant's boyfriend at the time, and is now appellant's husband. This go-kart is not the ordinary type one would expect to find at amusement parks or at Ocean City, Maryland. Rather, it is a high-performance racing go-kart capable of reaching speeds in excess of 100 m.p.h., is between six and seven feet long, and rides only inches from the track surface. When in the reclined driving position, the driver's head rests against a headrest in the rear of the vehicle. In this position, according to appellant's estimation, the driver's head is approximately four inches from the rear-mounted engine and rear axle. There are no seatbelts or shoulder harnesses, and the rear axle, which is also very close to the driver's head, is exposed and is not equipped with any type of shield or guard.

The racing event, in which appellant suffered her tragic injuries, was held at the Summit Point Raceway (raceway) in Summit Point, West Virginia. The raceway is Woodbridge's "home" track. Both Margay and Eastern are identified in Woodbridge's 1993 Driver Information Packet and on the 1993 Pit Pass as sponsors of the event. Appellant attended the event with Kane. Prior to the Summit Point event, appellant had never raced in a go-kart race. Indeed, she had never previously operated a racing go-kart. Appellant was not a member of Woodbridge or of any other go-kart club and her only experience with go-kart racing was when she accompanied Kane to a go-kart racing event in Charlotte, North Carolina in late August 1993. During the Charlotte event, in which Kane raced the go-kart, appellant assisted Kane with changing certain go-kart parts and making various adjustments to the go-kart in preparation for the races. She also helped Kane start the go-kart's motor with a special starter unit and timed Kane's laps.

When the couple arrived for the Summit Point event, a raceway attendant handed them a clipboard with a form on it that they were required to sign in order to enter the raceway. The form, entitled "Release and Waiver of Liability, Assumption of Risk and Indemnity Agreement" (Release), reads as follows:

IN CONSIDERATION of being permitted to compete, officiate, observe, work for, or participate in any way in the EVENT(S) or being permitted to enter for any purpose any RESTRICTED AREA (defined as any area requiring special authorization, credentials, or permission to enter or any area to which admission by the general public is restricted or prohibited), EACH OF THE UNDERSIGNED, for himself, his personal representatives, heirs, and next of kin:

1. Acknowledges, agrees, and represents that he has or will immediately upon entering any of such RESTRICTED AREAS, and will continuously thereafter, inspect the RESTRICTED AREAS which he enters and he further agrees and warrants that, if at any time, he is in or about RESTRICTED AREAS and he feels anything to be unsafe, he will immediately advise the officials of such and will leave the RESTRICTED AREAS and/or refuse to participate further in the EVENT(s).

2. HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE the promoters, participants, racing associations, sanctioning organizations or any subdivision thereof, track operators, track owners, officials, car owners, drivers, pit crews, rescue personnel, any persons in any RESTRICTED AREA, promoters, sponsors, advertisers, owners and lessees of premises used to conduct the EVENT(S), premises and event inspectors, surveyors, underwriters, consultants and others who give recommendations, directions, or instructions or engage in risk evaluation or loss control activities regarding the premises or EVENT(S) and each of them, their directors, officers, agents and employees, all for the purposes herein referred to as "Releasees," FROM ALL LIABILITY TO THE UNDERSIGNED, his personal representatives, assigns, heirs,

and next of kin FOR ANY AND ALL LOSS OR DAMAGE, AND ANY CLAIM OR DEMANDS THEREFOR ON ACCOUNT OF INJURY TO THE PERSON OR PROPERTY OR RESULTING IN DEATH OF THE UNDERSIGNED ARISING OUT OF OR RELATED TO THE EVENT(S), WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

3. HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS the Releasees and each of them FROM ANY LOSS, LIABILITY, DAMAGE, OR COST they may incur arising out of or related to the EVENT(S) WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

4. HEREBY ASSUMES FULL RESPONSIBILITY FOR ANY RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE arising out of or related to the EVENT(S) whether caused by the NEGLIGENCE OF RELEASES or otherwise.

5. HEREBY acknowledges that THE ACTIVITIES OF THE EVENT(S) ARE VERY DANGEROUS and involve the risk of serious injury and/or death and/or property damage. Each of THE UNDERSIGNED also expressly acknowledges that INJURIES RECEIVED MAY BE COMPOUNDED OR INCREASED BY NEGLIGENT RESCUE OPERATIONS OR PROCEDURES OF THE RELEASEES.

6. HEREBY agrees that this Release and Waiver of Liability, Assumption of Risk and Indemnity Agreement extends to all acts of negligence by the Releasees, INCLUDING NEGLIGENT RESCUE OPERATIONS and is intended to be as broad and inclusive as is permitted by the laws of the Province or State in which the Event(s) is/are conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.

I HAVE READ THIS RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT, FULLY UNDERSTAND ITS

TERMS, UNDERSTAND THAT I HAVE GIVEN UP SUBSTANTIAL RIGHTS BY SIGNING IT AND HAVE SIGNED IT FREELY AND VOLUNTARILY WITHOUT ANY INDUCEMENT, ASSURANCE OR GUARANTEE BEING MADE TO ME AND INTEND MY SIGNATURE TO BE A COMPLETE AND UNCONDITIONAL RELEASE OF ALL LIABILITY TO THE GREATEST EXTENT ALLOWED BY LAW.

According to appellant, she did not read the Release because she did not believe there was sufficient time to do so with several cars behind them waiting to enter the raceway. In any event, appellant stated that she felt that she had no choice but to sign the Release if she wanted to enter the raceway. Appellant further alleged that she was never given a copy of the Release, nor did anyone at the event discuss the Release with her, explain its terms and scope, or discuss the risks of injury associated with the racing event.

Upon her arrival at the raceway for the Summit Point event, appellant planned to attend a course for novice drivers, but Woodbridge cancelled the course due to morning rain. Woodbridge's policy regarding novice drivers attending the novice class is reflected in its 1993 Driver Information Packet, as follows: "All novices (persons who have competed in less than three (3) races) must attend novice school, if the novice school is offered before being allowed to race or practice. It is recommended that first time drivers to the track also attend the novice school." Indeed, prior to appellant's participation, no one from Woodbridge (1) asked appellant whether she had ever driven in a go-kart race before or had go-kart racing experience; (2) told appellant that she could not drive in a race without participating in a training session for first-time drivers; (3) gave appellant an information packet or any other materials containing safety instructions or warnings; or (4) asked appellant whether she was a member of Woodbridge.

Rather, appellant simply paid an entry fee and obtained a go-kart tag number. A Woodbridge official checked the go-kart to confirm that it met racing specifications and to make

sure that it was not improperly modified. The race official also inspected appellant's racing helmet to make sure that it was a regulation helmet. No one, however, asked appellant to put the helmet on to see whether it fit properly.

Before the race, appellant drove the go-kart three times around the track during a practice run. Prior to the practice run, appellant put her shoulder length hair in a ponytail with a rubber band, folded it up onto the top of her head so that the ponytail would be inside the helmet, and tucked a few loose hairs into the collar of her racing suit. During the practice run, appellant's hair did not fall down or come out of her helmet.

After the practice run, but before the race, appellant attended a brief driver's meeting conducted by a Woodbridge official. During this meeting, track conditions, flag positions, and safety rules relating to driving the go-karts were discussed. According to appellant, at no time during the meeting, or otherwise, did anyone ever warn her that loose clothing or hair could be dangerous while driving the go-kart. Specifically, no one instructed appellant to use a hair net or stocking to keep her hair in place inside the helmet so that it would not get caught in the go-kart's moving parts.

Shortly after the meeting, the race in which appellant would drive started. About twenty-minutes into her race, with more than seven laps completed, appellant's hair got caught in the rear axle of the go-kart. This caused appellant's scalp to be torn literally from her head. Appellant was taken by ambulance to a local hospital, but, due to the nature of her injury, she had to be flown by helicopter to the Washington Hospital Center in Washington D.C. At the Washington Hospital Center, surgeons attempted to re-attach her scalp, which was lacerated into five pieces. Unfortunately, appellant's scalp could not be saved, and skin grafts from her leg and buttocks were necessary. Over the course of the next several weeks, appellant underwent multiple operations (totalling many hours) and vigorous physical therapy. Her injuries range from the permanent loss of her scalp, hair, and eyebrows, to

muscle and nerve damage preventing her eyelids from properly closing. Appellant states that she suffers from severe emotional problems associated with the accident and the loss of her hair and scalp.

Although understanding that go-kart racing involved certain dangers (e.g., collisions with other go-karts, overturning go-karts), appellant alleges that she never thought about, considered, understood, or contemplated the possible danger of her hair getting caught in the go-kart's moving parts and her scalp being torn from her head. Nonetheless, appellant stated in pre-trial discovery that she arranged her hair in the above-described fashion "[b]ecause I had a definitely instinctive fear of my hair dangling in that affair, whether it be getting in my face, keeping me from seeing or whether it getting caught in moving parts, that did not occur to me then but it just occurred to me that it would [be] dangerous." Additionally, prior to her accident, appellant was aware of the go-kart's moving parts behind the headrest, and was at least familiar with the general setup of the go-kart.

On July 8, 1994, appellant filed a four-count complaint against Woodbridge, Margay, and Eastern in the Circuit Court for Anne Arundel County. In the first count, appellant sued Margay and Eastern for strict product liability, alleging that the go-kart was defectively designed. In the second count, she sued Margay and Eastern for strict product liability, alleging that Margay and Eastern should have warned appellant of the design defects and latent dangers associated with the exposed rear axle. In the third count, appellant sued Margay and Eastern for negligently designing the go-kart. In the fourth count, appellant sued Woodbridge for negligently failing to warn her that loose hair or clothing could get caught in the go-kart's moving parts and cause her injury.

Woodbridge filed a motion for summary judgment arguing, among other things, that there was no evidence of negligence on its part, and that, in any event, appellant's claim was barred by operation of the Release. A hearing on the motion was held on March 28, 1995. The circuit court ruled from the

bench, stating that "it is clear from the language of this release that [appellant] has fully released [Woodbridge]." Accordingly, the trial judge granted summary judgment in favor of Woodbridge. A written order to the same effect followed.

Margay and Eastern also filed motions for summary judgment. On April 24, 1995, the circuit court heard argument on the motions. Following the hearing, on May 12, 1995, the circuit court issued a written Memorandum of Opinion and Order granting summary judgment in favor of Margay and Eastern. Therein, the circuit court determined that the Release barred all of appellant's claims, including the strict product liability claims, against Margay and Eastern since both were "sponsors," and therefore "releasees," under the Release. Additionally, the circuit court ruled that appellant assumed the risk of her injuries and was contributorily negligent.

From these orders, appellant appeals to this Court.

## LEGAL ANALYSIS

### Standard of Review and Choice of Law

Preliminary, it is necessary to set forth the principles governing our standard of review on this appeal. MD.RULE 2–501(a) (1995) permits a party to "file at any time a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law." In response to a motion for summary judgment, the opposing party "shall identify with particularity the material facts that are disputed." MD.RULE 2–501(b) (1995). The summary judgment proceeding is not a substitute for a trial on the merits, but is a proceeding to determine whether a trial is needed to resolve a factual dispute. *Foy v. Prudential Ins. Co.*, 316 Md. 418, 422, 559 *A.*2d 371 (1989); *Faulkner v. American Cas. Co.*, 85 Md.App. 595, 614, 584 A.2d 734 (1991).

A material fact is a fact the resolution of which will somehow affect the outcome of a case. *King v. Bankerd*, 303

Md. 98, 111, 492 A.2d 608 (1985). If the facts are susceptible to multiple inferences, all inferences must be resolved in favor of the non-moving party (appellant in this case). *Id.* In addition, the inferences drawn must be reasonable. *Beatty v. Trailmaster Products, Inc.,* 330 Md. 726, 739, 625 A.2d 1005 (1993). Where several inferences may be drawn, summary judgment must be denied and the dispute submitted to the trier of fact. *King,* 303 Md. at 111, 492 A.2d 608. Conclusory denials or bald allegations will not defeat a motion for summary judgment. *See Seaboard Sur. Co. v. Richard F. Kline, Inc.,* 91 Md.App. 236, 243, 603 A.2d 1357 (1992). Similarly, a mere scintilla of evidence in support of the non-moving party's claim is insufficient to avoid the grant of summary judgment. *Beatty,* 330 Md. at 738, 625 A.2d 1005.

Additionally, it is critical to note that, although suit was filed in a Maryland court, this case is governed by West Virginia law. Specifically, as the parties concede and as the trial court recognized, under the doctrine of *lex loci contractus,* the meaning and enforceability of the Release is governed by West Virginia law, *American Motorists Ins. Co. v. ARTRA Group, Inc.,* 338 Md. 560, 659 A.2d 1295 (1995),[1] and under the doctrine of *lex loci delicti,* the substantive tort law principles of the accident are those of West Virginia. *Ward v. Nationwide Mut. Auto. Ins. Co.,* 328 Md. 240, 244 n. 2, 614 A.2d 85 (1992).

### West Virginia Legal Principles

Before turning to the merits of this appeal, we shall present an overview of the West Virginia legal principles germane to this case. At the onset, we note that both parties have diligently and thoroughly presented to this Court many cases from West Virginia and other jurisdictions in support of their respective positions. After considering the issues and examining the authorities presented, we are convinced, however, that

---

1. *ARTRA Group*'s modification of the doctrine of *lex loci contractus,* by adding the *renvoi* exception, does not affect the choice of law aspect of this case.

the outcome of this appeal devolves, in large part, upon a proper understanding and application of one case—*Murphy v. North Am. River Runners, Inc.*, 186 W.Va. 310, 412 S.E.2d 504 (1991). Because *Murphy* is of utmost importance to the disposition of this appeal, it is necessary to examine it in detail.

The issue in *Murphy* was as follows:

[W]hether the trial court ... properly granted a summary judgment to the defendant on the ground that the anticipatory release executed by the plaintiff was a complete bar to any action by the plaintiff against the defendant for injuries sustained by the plaintiff during a whitewater rafting expedition conducted by the defendant.

*Id.* at 507. In *Murphy*, the plaintiff went whitewater rafting as a paying passenger in a raft owned and operated by the defendant. *Id.* The guide of the raft in which the plaintiff was a passenger attempted a rescue operation of another raft that had become stuck among the rocks in the rapids of the river. *Id.* at 507–08. In an attempt to dislodge the stranded raft, the guide intentionally bumped the plaintiff's raft into the stranded raft. *Id.* at 508. As a result, the plaintiff was thrown about the raft, causing a serious knee and ankle injury. *Id.*

Prior to the rafting trip, the plaintiff had signed a document that the defendant had drafted, entitled "Raft Trip Release, Assumption of Risk & Permission" (raft release). *Id.* The pertinent provisions of the raft release were set forth in *Murphy* as follows:

during the raft trip ... certain risks and dangers exist or may occur, including, but not limited to, hazards of traveling on a rubber raft in rough river conditions using paddles or oars and other raft equipment, hiking in rugged terrain, being injured by animals, reptiles or others, becoming ill in remote places without medical facilities available, and being subject to the forces of nature ...

In consideration of the right to participate in such river trip, ... **I UNDERSTAND AND DO HEREBY AGREE**

TO ASSUME ALL OF THE ABOVE RISKS AND OTH-
ER RELATED RISKS WHICH MAY BE ENCOUN-
TERED ON SAID RAFT TRIP, INCLUDING ACTIVI-
TIES PRELIMINARY AND SUBSEQUENT THERETO.
I do hereby agree to hold [defendant] harmless from any
and all liability, actions, causes of actions, claims, expenses,
and damages on account of injury to my person or property,
even injury resulting in death, which I now have or which
may arise in the future in connection with my trip or
participation in any other associated activities . . .

I expressly agree that this release, waiver and indemnity
agreement is intended to be as broad and inclusive as
permitted by the law of the State of West Virginia and that
if any portion thereof is held invalid, it is agreed that the
balance shall, notwithstanding, continue in full legal force
and effect. This release contains the entire agreement
between the parties hereto and the terms of this release are
contractual and not a mere recital.

*　　*　　*　　*　　*　　*

I further state that **I HAVE CAREFULLY READ THE
FOREGOING RELEASE AND KNOW THE CONTENTS
THEREOF AND I SIGN THIS RELEASE AS MY OWN
FREE ACT.** This is a legally binding document which I
have read and understood.

*Id.* at 508, n. 3.

After the injury, the plaintiff filed suit against the defen-
dant, alleging that the defendant's guide negligently, careless-
ly, and recklessly caused her injuries. *Id.* at 508. The
defendant moved for summary judgment based on the terms
of the raft release. *Id.* In opposition to the motion, the
plaintiff filed an affidavit of an experienced river guide who
opined that there existed reasonable alternatives to the above-
described rescue operation that would have posed no risk of
harm to the passengers of the plaintiff's raft. *Id.* The
plaintiff also filed her own affidavit stating that she was not
informed in advance of the possibility that her raft might be
involved in the rescue of a stranded raft by the "bumping" of

her raft into the stranded raft. *Id.* The plaintiff's affidavit further stated that she never contemplated that the raft release covered such intentional acts, but only applied to ordinary negligence in the form of piloting errors associated with an ordinary rafting trip. The trial court granted summary judgment based on the raft release. *Id.*

On appeal, the Supreme Court of Appeals of West Virginia explained the law as follows:

> Generally, in the absence of an applicable safety statute, a plaintiff who *expressly* and, under the circumstances, *clearly* agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct may not recover for such harm, unless the agreement is invalid as contrary to public policy. When such an express agreement is freely and fairly made, between parties who are in an equal bargaining position, and there is no public interest with which the agreement interferes, it generally will be upheld.

> A clause in an agreement exempting a party from tort liability is, however, unenforceable on grounds of public policy if, for example, (1) the clause exempts a party charged with a duty of public service from tort liability to a party to whom that duty is owed, or (2) the injured party is similarly a member of a class which is protected against the class to which the party inflicting the harm belongs.

> &ast; &ast; &ast; &ast; &ast; &ast;

> In order for an express agreement assuming the risk to be effective, it must appear that the plaintiff has given his or her assent to the terms of the agreement. Particularly where the agreement is prepared by the defendant, it must appear that the terms were in fact brought home to, and understood by, the plaintiff, before it may be found that the plaintiff has agreed to them. Stated another way, "to relieve a party from liability for his [or her] own negligence

by contract, language to that effect must be clear and definite." [2]

Moreover, in order for the express agreement to assume the risk to be effective, it must also appear that its terms were intended by both parties to apply to the particular conduct of the defendant which has caused the harm. To determine whether there was such intent, when the agreement is prepared by the defendant, its terms will be construed strictly against the defendant.

In particular, a general clause in a pre-injury exculpatory agreement or anticipatory release purporting to exempt a defendant from all liability from any future loss or damage will not be construed to include the loss or damage resulting from the defendant's intentional or reckless misconduct or gross negligence, unless the circumstances clearly indicate that such was the plaintiff's intention. Similarly, a general clause in an exculpatory agreement or anticipatory release exempting the defendant from all liability for any future negligence will not be construed to include intentional or reckless misconduct or gross negligence, unless such intention clearly appears from the circumstances.

These specific rules of anticipatory release construction are related to the general rule that "[a] release ordinarily covers only such matters as may fairly be said to have been within the contemplation of the parties at the time of the execution." [3]

*Id.* at 508–511 (citations omitted).

After reciting these principles of law, the *Murphy* court observed that the West Virginia Whitewater Responsibility Act (Act) applied. *Id.* at 511. According to the court, the Act's purpose is to define those areas of responsibility for which commercial whitewater guides are liable for injury, in

---

**2.** *Quoting Bowlby–Harman Lumber Co. v. Commodore Serv., Inc.,* 107 S.E.2d 602, 607 (W.Va.1959).

**3.** *Quoting* syl. pt. 2, *Conley v. Hill,* 115 W.Va. 175, 174 S.E. 883 (1934), *overruled on another point in* syl. pt. 4, *Thornton v. Charleston Area Medical Ctr.,* 158 W.Va. 504, 213 S.E.2d 102 (1975).

light of the fact that it is impossible to eliminate the inherent risks involved in whitewater rafting. *Id.* The court further stated that the Act imposes certain duties on whitewater guides, recognizes liability for breach of these duties, and immunizes guides from liability for injuries resulting from the inherent risks of the activity "which are essentially impossible to eliminate regardless of all feasible safety measures." *Id.*

One such statutorily imposed duty requires guides to conform to the standard of care expected from members of the profession. *Id.* at 512. Accordingly, the court held as follows:

> As stated previously, when a statute imposes a standard of care, a clause in an agreement purporting to exempt a party from tort liability to a member of the protected class for failure to conform to that statutory standard is unenforceable. Therefore, to the extent that the anticipatory release in the present case purports to exempt the defendant from tort liability to the plaintiff for the failure of the defendant's guide to conform to the standard of care expected of members of his occupation, it is unenforceable.

*Id.* (citations omitted). Thus, because the plaintiff's experienced guide essentially opined in the affidavit that the defendant's guide failed to observe the standard of care expected of members of his occupation during a rescue operation, a genuine issue of material fact was raised, and the trial court should not have granted summary judgment. *Id.*

Next, and more significantly, the court observed that the plaintiff's complaint "explicitly alleges that the defendant's conduct was reckless, as well as negligent." *Id.* As a result, the West Virginia high court stated:

> As stated previously, a general clause in a pre-injury exculpatory agreement or anticipatory release purporting to exempt a defendant from all liability for any future loss or damage will not be construed to include the loss or damage resulting from the defendant's intentional or reckless misconduct or gross negligence, unless the circumstances clearly indicate that such was the plaintiff's intention. This rule parallels the rule that "[a] release is construed from the

standpoint of the parties at the time of its execution. Extrinsic evidence is admissible to show both the relation of the parties and the circumstances which surrounded the transaction."[4]

*Id.* The court then recognized that contract construction is a matter for the court. *Id.* Where the meaning of a contract is uncertain and ambiguous, parol evidence is admissible to demonstrate the situation of the parties, the surrounding circumstances when the contract was made, and the construction that the parties give to the contract, either contemporaneously or subsequently. *Id.* at 512–13. Where the parol evidence is not in conflict, the court must construe the contract. *Id.* at 513. Where, however, there is a conflict on a material point necessary to interpret the contract, the meaning of the contract is a matter for the jury. *Id.* After reciting these principles, the court held as follows:

> In light of the inquiry needed here concerning the *relation of the parties* and the *circumstances surrounding the execution of the anticipatory release in order to determine the parties' intent* with respect to reckless conduct of the defendant, the trial court improperly granted the defendant's motion for summary judgment. "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law."

> Accordingly, this Court reverses and vacates the summary judgment entered in favor of the defendant and remands this case for further proceedings consistent with this opinion.

*Id.* (citations omitted) (emphasis added).

There is a very critical aspect of *Murphy* that must not be overlooked. The Supreme Court of Appeals of West Virginia held that the trial court improperly granted summary judg-

---

4. *Quoting* syl. pt. 1, *Cassella v. Weirton Constr. Co.,* 161 W.Va. 317, 241 S.E.2d 924 (1978).

ment on the recklessness claim, despite the fact that the raft release specifically stated that the plaintiff agreed "to hold [defendant] harmless from *any and all* liability, actions, causes of actions, claims, expenses, and damages . . .," and that the plaintiff agreed that the raft release "is intended to be as *broad and inclusive as permitted* by the law of the State of West Virginia. . . ." (Emphasis added). It is relatively clear that the West Virginia high court held that summary judgment was inappropriate because the plaintiff generated a genuine issue of fact by her affidavit, which stated that she never contemplated that the raft release covered intentional acts, but only covered ordinary acts of negligence such as piloting errors associated with an ordinary ride on the river. In other words, despite the defendant's obvious attempt to draft the raft release in a very broad and all-inclusive manner, recklessness was not covered because the plaintiff, by her affidavit, successfully raised a genuine issue of fact regarding whether such conduct was contemplated by the release.[5]

Another important aspect of *Murphy* that must be kept in mind on this appeal is that Murphy necessarily considered the above-italicized language (preceding paragraph) of the raft release to be ambiguous. If it were otherwise, the West Virginia high court would not have remanded the case because it could have, as a matter of law, construed the contract—after all, the court expressly recognized that contract construction of an unambiguous contract is for the court. At first blush the language of the raft release may not necessarily appear ambiguous. That the West Virginia high court determined that the raft release contained ambiguous language, however, is not surprising, in light of certain principles embodied in West Virginia law: (1) such releases will be construed against the

---

5. Significantly, the court seemed to recognize that nothing would prevent an anticipatory release from expressly covering reckless conduct. *Id.* at 512 n. 10 ("We do not attribute to the *legislature* the intent to immunize commercial whitewater outfitters . . . from liability for intentional or reckless misconduct or gross negligence. . . . On the other hand, we also do not attribute to the legislature the intent that the *parties* may not have the contractual freedom to agree that the plaintiff assumes the risk of such conduct.").

drafter; (2) the bargaining positions of the parties must be considered; and (3) the parties' intention and contemplation regarding the scope and coverage of the release must be considered. We further observe that, in *Murphy*, the West Virginia high court relied on RESTATEMENT (SECOND) OF TORTS § 496B (and various comments thereto) for many of the above principles of law relating to anticipatory releases. We are confident, therefore, that we may turn to RESTATEMENT (SECOND) OF TORTS § 496B for additional guidance should *Murphy* or other West Virginia case law not cover all issues in this case.[6] As it turns out, however, *Murphy* rather adequately

---

6. Section 496B reads as follows:

> A plaintiff who by contract or otherwise expressly agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct cannot recover for such harm, unless the agreement is invalid as contrary to public policy.

Comment c (cited in *Murphy*, at 510), and illustration 1, of this section read as follows:

> In order for an express agreement assuming the risk to be effective, it must appear that the plaintiff has given his assent to the terms of the agreement. Particularly where the agreement is drawn by the defendant, and the plaintiff's conduct with respect to it is merely that of a recipient, it must appear that the terms were in fact brought home to him and understood by him, before it can be found that he has accepted them.

Illustration:

> 1. A, attending a theatre, checks his hat in B's check room. He is handed a ticket, on the back of which, in fine print, it is stated that B will not be liable for any loss or damage to the hat. Reasonably believing the ticket to be a mere receipt, A accepts it without reading it. B negligently loses the hat. A is not bound by the provision on the back of the ticket.

Comment d (also cited in *Murphy*, at 510) reads as follows:

> In order for the agreement to assume the risk to be effective, it must also appear that its terms were intended by both parties to apply to the particular conduct of the defendant which has caused the harm. Again, where the agreement is drawn by the defendant and the plaintiff passively accepts it, its terms will ordinarily be construed strictly against the defendant. In particular, general clauses exempting the defendant from all liability for loss or damage will not be construed to include loss or damage resulting from his intentional, negligent, or reckless misconduct, unless the circumstances clearly indicate that such was the plaintiff's understanding and intention. On the same basis, general clauses exempting the defendant from all liability for negligence will not be construed to include intentional or

answers most of our concerns on this appeal.[7]

Keeping all of the foregoing principles in mind, we turn to the merits of this appeal.

## I

First, appellant argues that the circuit court erred in granting summary judgment in favor of Margay and Eastern on the ground that the Release fully released Margay and Eastern of appellant's strict product liability claims. We agree.

Construing the facts in the light most favorable to appellant, as we must, we hold that, under *Murphy*, appellant has generated a genuine dispute of material fact sufficient to overcome Margay's and Eastern's motions for summary judgment on the strict product liability claims. Preliminarily, we recognize that the trial court was correct in determining that Margay and Eastern were "sponsors" under the Release, and therefore were "releasees" under the Release. This, however, is insufficient to cause the Release to shield Margay and Eastern from appellant's strict product liability claims. We explain.

■ Appellant's affidavit in opposition to Margay's and Eastern's motions for summary judgment unequivocally states that she never contemplated or intended that the Release would bar these claims, and that nobody ever informed her that this might be the case. To be sure, the Release purports to cover all claims "caused by the NEGLIGENCE OF RELEASEES or otherwise," and "is intended to be as broad and inclusive as is permitted by the laws of" West Virginia. Additionally, appellant's signature was intended "TO BE A COMPLETE AND UNCONDITIONAL RELEASE OF ALL

---

reckless misconduct, or extreme or unusual kinds of negligence, unless such intention clearly appears.

7. Two other cases, *King v. Kayak Mfg. Corp.*, 182 W.Va. 276, 387 S.E.2d 511 (1989), and *Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979), aid our analysis with respect to the fourth and fifth questions presented. These cases will be discussed in detail when we address those questions.

LIABILITY TO THE GREATEST EXTENT ALLOWED BY LAW." As explained above, however, the raft release in *Murphy* employed similarly broad and all-inclusive language, yet the plaintiff generated a genuine dispute of fact regarding whether she intended to release her claims against the defendant for reckless conduct by her affidavit stating that she never intended to give up such claims.

In the same way that there is a factual dispute regarding whether the plaintiff in *Murphy* intended the release to bar claims for the defendant's reckless conduct, there is a factual dispute regarding whether appellant in the instant case intended the Release to bar claims of strict product liability. Strictly construing the Release against Margay and Eastern, as *Murphy* requires, we can safely say that a reasonable person in appellant's position would not contemplate or intend that the Release would eliminate strict product liability claims against the manufacturer and seller of the go-kart. Indeed, while a driver might expect to be releasing claims for ordinary injuries associated with racing a go-kart, e.g., "spin-outs," collisions, etc., it is entirely reasonable to conclude that surrendering claims for product liability against the manufacturer and seller of the go-kart would be the farthest thing from a driver's mind upon signing the Release at the entrance of the raceway. This is what appellant has stated in affidavits and discovery, and her statements are undisputed fact for purposes of summary judgment. Under *Murphy*, therefore, we hold that summary judgment was improperly granted in this regard.

■ Furthermore, appellant's sworn statements, taken in the light most favorable to her, were sufficient to demonstrate that there was "an unequal bargaining position" with respect to the Release. *Murphy*, 412 S.E.2d at 509. Appellant points out that her affidavit stated, "No one discussed this Release with me, explained its terms or made clear to me its scope, or discussed with me any of the risks of injury associated with the racing event and purportedly covered by the Release." She further stated that there was pressure to sign the Release

and that there was insufficient time for a meaningful reading of the Release, because cars were behind her waiting to enter the raceway. In addition, if she wanted to enter the raceway, she had no choice but to sign the Release. Moreover, she did not arrive at the raceway by herself, but rather accompanied Kane, and was several hours away from home. As *Murphy* clearly considers the circumstances under which the Release was signed and the relation between the parties to be critical in determining whether an anticipatory release will be effective, these facts undeniably generate, at a minimum, a genuine dispute of material fact.

In many regards, the facts surrounding appellant's signing of the Release, as viewed most favorably to her, are similar to those in illustration 5 under comment j of RESTATEMENT (SECOND) OF TORTS § 496B, which states as follows:

> In a crowded city, A drives his car around for half an hour without finding a place to park it. Having no other way to leave his car in order to transact important business, he drives it into B's garage. B gives him a ticket, of a type in general use in garages and parking places in the city, which states on its face that the car is left entirely at A's risk, and that B will not be liable for any loss or damage, even though it is due to his negligence. A reads the ticket and accepts it without comment. Through the negligence of B the car is stolen. The terms of the ticket are not effective to bar A's recovery from B for the loss of the car.

Indeed, as comment j explains, the disparity in bargaining power may arise from

> the defendant's monopoly of a particular field of service, from the generality of use of contract clauses insisting upon assumption of risk by all those engaged in such a field, so that the plaintiff has no alternative possibility of obtaining the service without the clause; or it may arise from the exigencies of the needs of the plaintiff himself, which leave him no reasonable alternative to the acceptance of the offered terms.

Consistent with comment j and illustration 5, appellant's sworn factual statements are sufficient to meet the minimum requirements for defeating a motion for summary judgment.[8]

Additionally, as *Murphy* requires, "it must appear that the terms [of the Release] were in fact brought home to, and understood by, the plaintiff, before it may be found that the plaintiff has agreed to them." *Id.* Alternatively stated, to relieve contractually a party from liability for its negligence, language to that effect must be clear and definite. *Id.* In light of *Murphy*'s strict construction of the raft release against the defendant in that case, we are satisfied that the Release in the instant case is not sufficiently clear and definite to enable us to conclude, as a matter of law, that appellant must have understood the Release to cover the strict product liability claims.

Based on the foregoing, we hold that the circuit court erred in granting summary judgment in favor of Margay and Eastern on appellant's strict product liability claims. Despite the fact that both Margay and Eastern are releasees under the Release, appellant has presented sufficient facts to generate a jury question regarding whether the Release extinguishes those claims.[9]

---

**8.** Although *Murphy* does not cite this specific comment and illustration, as we previously explained, we are comfortable relying on the principles expressed therein and believe that those principles fairly and accurately represent what would be the law of West Virginia.

**9.** In its brief, appellant urges this Court to hold that the Release, at least to the extent that it purports to cover strict liability claims, is inoperative as a matter of West Virginia public policy. Appellant cites *Westlye v. Look Sports, Inc.*, 17 Cal.App.4th 1715, 22 Cal.Rptr.2d 781, 799–800 (1993), to support her position. Margay and Eastern, on the other hand, argue that *Zimmer v. Mitchell and Ness*, 253 Pa.Super. 474, 385 A.2d 437 (1978), stand for the opposite proposition. We have not found, nor have the parties directed us to, a West Virginia case or statute dealing with the precise issue. We are, therefore, in unchartered West Virginia legal territory. In addition, *Murphy* does not provide us with guidance in this regard. Because of our unique role on this appeal—determining what the West Virginia Supreme Court of Appeals would do under the circumstances—we do not declare that as a matter of West Virginia state public policy a release covering strict

## II

Next, appellant asserts that the circuit court erred in granting summary judgment in favor of Woodbridge, Margay, and Eastern based on the Release, because: (1) the Release allegedly was not intended to release claims for injuries not ordinarily associated with go-kart racing; and (2) the terms of the release were allegedly not made clear to appellant. Initially, because we addressed the propriety of summary judgment on the strict product liability claims against Margay and Eastern (counts I and II) in Part I of this opinion, our focus here is only on the propriety of summary judgment on appellant's negligence claim against Woodbridge (count IV) for negligently failing to warn her that loose hair or clothing could get caught in the go-kart's moving parts and cause her injury, and her remaining negligence claim against Margay and Eastern (count III) for negligently designing the go-kart.

Addressing the propriety of summary judgment on appellant's negligence claim against Woodbridge, as previously noted, the circuit court granted summary judgment for Woodbridge on the ground that the Release exculpated Woodbridge for any alleged negligence on its part. For the reasons stated above, that a genuine dispute of material fact exists with regard to whether there was an unequal bargaining position between the parties, we must reverse the circuit court's grant of summary judgment in favor of Woodbridge. We reiterate that appellant presented sufficient facts to generate a jury issue regarding whether the release was ineffective for a lack of an equal bargaining position. Accordingly, the case must be remanded on that basis.

In addition, summary judgment in favor of Woodbridge was improper because appellant raised a genuine dis-

product liability claims is void. We need not make such a determination because appellant states in her brief, "This Court need not reach that issue, however, because the circuit court's application of the Release to bar [appellant's] strict product liability claims against Margay and Eastern Karting—especially as a *matter of law* on a motion for summary judgment—was erroneous in any event."

pute of material fact in two further respects. First, appellant presented sufficient facts to demonstrate that the Release was not intended to cover her claim against Woodbridge. As we explained above, *Murphy* held that in order for an anticipatory release to be effective, it must "appear that its terms were intended by both parties to apply to the particular conduct of the defendant which has caused the harm. To determine whether there was such intent, when the agreement is prepared by the defendant its terms will be construed strictly against the defendant." *Murphy*, 412 S.E.2d at 510. Appellant stated that she never contemplated assuming the risk of getting her hair caught in the go-kart's rear axle, but rather only assumed the ordinary risks of go-kart racing. Thus, construing the Release against Woodbridge, we hold that *Murphy* requires this Court to reverse the grant of summary judgment because appellant has generated a genuine dispute of material fact that she never intended to release Woodbridge of the duty to warn her of the danger of her hair getting caught in the go-kart's rear axle.

Second, construing matters most favorably to appellant, she has demonstrated that the Release does not bar her claim against Woodbridge because the terms of the release were not brought home to and understood by appellant. As we have already seen, under *Murphy*, "it must appear that the terms [of the Release] were in fact brought home to, and understood by, the plaintiff, before it may be found that the plaintiff has agreed to them." *Id.* In other words, according to *Murphy*, to relieve contractually a party from liability for its negligence, language to that effect must be clear and definite. *Id.* Under the holding in *Murphy*, the language of the Release is not sufficiently clear and definite such that appellant must have understood the Release to release Woodbridge of the duty to warn her of the risks and dangers of hair getting caught in the go-kart's exposed rear axle, as opposed to the duty to warn of ordinary risks associated with go-kart driving.

Lastly, we shall address whether summary judgment in favor of Margay and Eastern was proper on appellant's negligence claim against Margay and Eastern for negligently designing the go-kart. We hold, consistent with our reasoning above, that summary judgment was improper. First, appellant has raised a genuine dispute of material fact regarding unequal bargaining positions. Second, appellant's sworn statements sufficiently demonstrate that the Release was not intended to cover her claim against Margay and Eastern for negligently designing the go-kart. Her allegations that she only assumed the ordinary risks associated with go-kart racing, and not risks associated with a poorly designed go-kart, are sufficient under *Murphy* for her to avoid a grant of summary judgment against her on this claim. Finally, the terms of the Release are not sufficiently clear and definite under *Murphy* to enable us to conclude that appellant understood the Release to cover claims against Margay and Eastern for negligent design of the go-kart.

### III

As we explained in Part II above, the circuit court erred in granting summary judgment in Woodbridge's favor. We wish to make clear, however, that we do not base that holding on the argument reflected in appellant's third question presented—namely, that the circuit court erred in granting summary judgment for Woodbridge based on the Release because the evidence in the record purportedly establishes a genuine dispute as to whether appellant intended to release claims arising from Woodbridge's allegedly reckless conduct. In other words, in addition to those arguments in Part II above, appellant argues that Woodbridge was not entitled to summary judgment because the record, viewed in appellant's favor, contains evidence of reckless conduct on Woodbridge's part, and that, therefore, under *Murphy*, the Release does not exculpate Woodbridge from liability for such conduct.

We observe that appellant initially raised this argument in opposition to Woodbridge's motion for summary judgment. In response to appellant's opposition, Woodbridge argued that

appellant never asserted a cause of action for reckless conduct (nor amended her complaint to add such a cause of action), and that reckless conduct, as a matter of law, cannot be inferred from the evidentiary materials submitted with appellant's opposition to the motion for summary judgment. Woodbridge, therefore, maintained that it would be improper for the circuit court to deny Woodbridge summary judgment based on appellant's reckless conduct argument. In granting summary judgment in favor of Woodbridge, the circuit court did not expressly address appellant's reckless conduct argument, but rather simply held that the Release exculpated Woodbridge.

We hold that the circuit court erred in granting summary judgment to Woodbridge for only those reasons expressed in Part II above. The circuit court did not err in granting Woodbridge summary judgment on the basis of the alleged reckless conduct because appellant failed to plead that cause of action. Thus, we agree with Woodbridge. Without regard to whether appellant has raised a genuine dispute of fact that Woodbridge somehow acted recklessly, we observe that appellant's complaint does not contain a claim against Woodbridge for liability based on reckless behavior. Rather, the "Fourth Count Against Defendant Woodbridge for Negligence" of appellant's complaint (which is the only count against Woodbridge) alleges a cause of action against Woodbridge strictly for ordinary negligence. In this regard, the complaint alleges that Woodbridge failed "to exercise ordinary and reasonable care and prudence" in "wholly failing and neglecting to warn, notify or instruct" appellant of the dangers of hair becoming caught in the go-kart's moving parts.

Because appellant has not sued Woodbridge based on reckless conduct, the circuit court did not err as appellant suggests. In other words, that the Release may not exculpate Woodbridge for reckless conduct under *Murphy* does not matter because appellant is not legally entitled to recover from Woodbridge for such conduct under the complaint as filed below. "Each cause of action shall be set forth [in the

complaint] in a separately numbered count." MD.RULE 2–303(a) (1995). *Whaley v. Maryland State Bank*, 58 Md.App. 671, 473 A.2d 1351 (1984), although not directly on point, adequately supports our reasoning. In *Whaley*, we determined that the trial court did not err in refusing to give the appellant's requested jury instructions on "negligent misrepresentation" because the appellant's sole cause of action in the counterclaim was "fraudulent misrepresentation." *Id.* at 679–80, 473 A.2d 1351. Accordingly, we held that "if they had wished to allege that [his] statements were negligent misrepresentations, appellants should have made the allegation in a separately numbered count." *Id.* at 680, 473 A.2d 1351.

Thus, *Whaley* makes clear that a claimant cannot recover on a cause of action not contained in its complaint. Likewise, in the instant case, appellant may not maintain an action against Woodbridge based on reckless conduct where her complaint only alleges a cause of action for ordinary negligence. The trial court, therefore, did not err in the manner in which appellant argues.[10]

## IV and V

As the remaining two questions are closely related, we shall address them together. We must determine whether the circuit court erred in granting summary judgment in favor of Margay and Eastern on the ground that appellant assumed the risk of her injury, and on the ground that appellant was contributorily negligent. The final part of the circuit court's written Memorandum of Opinion and Order granting summary judgment in favor of Margay and Eastern, in pertinent part, reads as follows:

---

10. We wish to make clear that we express no opinion regarding whether, under *Murphy*, reckless conduct on Woodbridge's part is covered under the Release. Furthermore, we express no opinion regarding whether appellant's sworn statements and other evidentiary materials submitted with her opposition to Woodbridge's motion for summary judgment were sufficient to generate a genuine dispute of material fact that Woodbridge may have acted recklessly.

3. Did the [appellant] assume the danger and the risk of possible injury by participating in the high speed competitive race held at [the raceway] on September 19, 1993?

As demonstrated, [appellant] knew the Go–Kart had exposed, fast moving parts, within inches of a drivers [sic] head. Additionally, [appellant] knew that dangling hair posed a danger in racing sports (note: [appellant] has very long hair). But, despite this knowledge, [appellant] engaged in the activity.

4. Was the [appellant] contributorily negligent in reference to the events that took place on September 19, 1993, at the racing event in which she participated?

West Virginia has chosen to call its form of contributory negligence "comparative contributory negligence." This form of contributory negligence holds that a party is not barred from recovering damages in a tort action so long as his negligence or fault does not equal or exceed the combined negligence or fault of the other parties against whom negligence is claimed.

There is no question that [appellant] was contributorily negligent, namely, she did not secure her hair properly.

(Citations omitted). We hold that the trial court erred in granting summary judgment on these two grounds.

### 1

We begin with an examination of West Virginia law concerning the defense of assumption of risk. In *King v. Kayak Mfg. Corp.*, 182 W.Va. 276, 387 S.E.2d 511, 517 (1989), West Virginia adopted what is known as "comparative assumption of risk." Comparative assumption of risk consists of two distinct principles.

First, "assumption of risk doctrine requires actual knowledge of the dangerous conditions...." *Id.* at 516. Thus, the plaintiff will be deemed to have assumed the risk where he "has full knowledge and appreciation of the dangerous condition and voluntarily exposes himself to it." *Id.* at

517. According to the West Virginia Supreme Court of Appeals, this is a "high standard," and, in several cases, the court has held that, as a matter of law, an assumption of risk jury instruction should not have been given. *Id.* Second, a "plaintiff is not barred from recovery by the doctrine of assumption of risk unless his degree of fault arising therefrom equals or exceeds the combined fault or negligence of the other parties to the accident." *Id.* at 517. Thus, "the plaintiff's degree of fault arising from the assumption of risk is determined by the jury, and the total award of damages is then diminished accordingly." *Id.* at 516.[11]

■ Under these principles, it is clear that the circuit court erred in granting summary judgment on the ground that appellant assumed the risk of the accident. The trial court was wrong in two regards. First, the trial judge failed to view the facts in the light most favorable to appellant. To be sure, there is evidence that appellant voluntarily drove the go-kart when she "knew the Go–Kart had exposed, fast moving parts, within inches of a drivers [sic] head," and "knew that dangling hair posed a danger in racing sports." Appellant, however, generated evidence demonstrating just the opposite. For example, in an affidavit, she stated as follows:

Before the race in which I drove, I placed my hair up inside my helmet in the same manner that I had done for the practice run. I did this to keep my hair out of my face and out of the way, which is something I had always done when engaging in sports activities, such as horseback riding or bicycle riding. I wasn't concerned about any particular danger relating to the Kart. The possibility that my hair might get caught in the Kart's axle never occurred to me— and certainly was not obvious to me—and no one warned me or even suggested there was a risk that this might

---

11. The defense of comparative assumption of risk "is available against a plaintiff in a product liability case where it is shown that the plaintiff had actual knowledge of the defective or dangerous condition, fully appreciated the risks involved, and continued to use the product." *King,* 387 S.E.2d at 518.

happen. I did not know about or appreciate this danger, and surely did not appreciate how extremely serious an injury could result from this danger, such as the injury that I suffered when my hair got caught and my scalp was torn from my head.

Clearly, in light of the above, appellant has raised a genuine dispute of material fact regarding whether she assumed the risk of her injury. We recognize that the record contains statements by appellant contradicting the above affidavit excerpt. This factual conflict, however, is not one that can be properly resolved on summary judgment, but must be left for the jury.

 Second, the trial judge should not have granted summary judgment in Margay's and Eastern's favor based on appellant's assumption of risk because the trial judge wholly ignored the "comparative" part of West Virginia's "comparative assumption of risk" doctrine. As we explained, appellant cannot be barred from recovery under the doctrine of assumption of risk unless her degree of fault arising therefrom equals or exceeds the combined fault or negligence of the other parties to the accident. Thus, even if it had been correct (which it would not have been in this case) for the trial court to hold that appellant assumed the risk as a matter of law, given the evidence that appellant presented of Margay's and Eastern's culpability, the jury would be needed to make the requisite comparability determination.

In sum, therefore, the trial court should not have granted summary judgment in Margay's and Eastern's favor on the ground that appellant assumed the risk of her injuries. In light of the evidence presented, this is a matter that the jury must resolve consistent with the West Virginia doctrine of comparative assumption of risk, as delineated in *King.*

### 2

 For similar reasons, we hold that the trial judge erred in granting summary judgment in favor of Margay and Eastern on the ground that appellant was contributorily negligent.

Under West Virginia law, "a party is not barred from recovering damages in a tort action so long as his negligence or fault does not equal or exceed the combined negligence or fault of the other parties involved in the accident." *Bradley v. Appalachian Power Co.,* 163 W.Va. 332, 256 S.E.2d 879, 885 (1979). In addition, "it will be the jury's obligation to assign the proportion or degree of this total negligence among the various parties, beginning with the plaintiff." *Id.* We observe that in West Virginia comparative contributory negligence is available in product liability cases. *See King,* 387 S.E.2d at 514 n. 3.

First, the circuit court erred because it again failed to view the facts in the light most favorable to appellant. In this regard, the circuit court held that "[t]here is no question that [appellant] was contributorily negligent, namely, she did not secure her hair properly." When viewed in the light *least* favorable to appellant, the simple fact that appellant's hair came down might indicate that she was negligent in the manner in which she secured her hair. There are other facts that indicate just the opposite. For example, appellant described methodically putting her hair in a ponytail with a rubber band, folding it up onto the top of her head so that the ponytail would be inside the helmet, and tucking a few loose hairs into the collar of her racing suit. She also stated that "[d]uring the practice run, [she] did not have any problem with [her] hair falling down or coming out of [her] helmet." Viewed in the light *most* favorable to appellant, this indicates that appellant secured her hair in a non-negligent manner.

Furthermore, the trial court's determination presumes that appellant had a duty to secure her hair in the first place. Indeed, this may be the case. Viewing the evidence in appellant's favor, however, it is conceivable that a jury might very well conclude that it would not be negligent for appellant, a first-time go-kart racer, to fail to take special steps beyond those actually taken to secure her hair in the absence of instructions to do so from raceway officials or some prior knowledge of danger on her part. In other words, a jury

could conclude that securing one's hair would not be something that would occur to a reasonable person under the circumstances, and in appellant's position as an inexperienced go-kart driver.

Second, as was discussed above with respect to the comparative assumption of risk defense, the trial court neglected to consider the "comparability" aspect of West Virginia's contributory negligence defense. Even if we assume for the sake of argument that appellant was negligent in the manner in which she secured her hair, a jury would be needed to determine whether her degree of negligence equals or exceeds the combined negligence or fault of Margay and Eastern.

As a result, the circuit court erred in granting summary judgment in Margay's and Eastern's favor based on appellant's alleged contributory negligence.

## CONCLUSION

Based on the foregoing, we affirm in part and reverse and remand in part the judgment of the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID EQUALLY BY APPELLEES.**