## MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION v. ROSENBERG

[No. 17 (Adv.), September Term, 1973.]

*Decided July 27, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Robert H. Levan*, General Counsel, with whom was *David D. Freishtat* on the brief, for appellant.

*John R. Miles*, with whom were *Kahler, DeBlasis, Shipley & O'Malley* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

In this appeal, stemming from the confrontation of a landowner and the appellant (the Commission), we are asked to consider what is known in Prince George's County as the "Adequate Public Facilities Ordinance." In some jurisdictions similar enactments have been called "timing and sequential control" ordinances. They are said by professional planners to be the most important advance in planning and zoning law since *Village of Euclid v. Ambler Realty Co.*, 272 U. S. 365 (1926). The Commission makes much of the fact that a similar ordinance has received the guarded approval of the Court of Appeals of New York. *Golden v. Planning Board of the Town of Ramapo*, 334 N.Y.S.2d 138 (1972). While we think the Prince George's County ordinance may have an inherent deficiency which the New York court would have frowned upon, we shall assume its validity, but only in aid of resolving the difference of opinion here presented. As we see this case the single issue is whether the action of the Commission was arbitrary and capricious. We think it was. However, before we undertake to relate the facts, we shall set forth the

522

pertinent parts of both the enabling act (Code of Public Local Laws of Prince George's County, § 59-76 (1963)), and the ordinance (Code of Ordinances and Resolutions of Prince George's County, § 3 (a) 16 (1967)): ·

" ... The regulations may provide for (1) the harmonious development of the district; (2) the coordination of roads within the subdivision with other existing, planned or platted roads or with other features of the district or with the commission's general·plan or with any road plan adopted or approved by the commission as part of the commission's general plan; (3) adequate open spaces for traffic, recreation, light, and air by dedication or otherwise, and the dedication to public use or conveyance of areas designated for such dedication under the provisions of zoning regulations relating to average lot size or planned community subdivision and for the payment of a monetary fee, in lieu of dedication, not to exceed five percent of the total assessed value of the land, to be used by the commission to purchase such open spaces for the use and benefit of the subdivision in cases where dedication would be impractical; (4) the reservation of lands for schools and other public buildings and for parks, playgrounds, and other public purposes, provided no reservation of land for traffic, recreation or any other public purposes as herein provided shall continue for longer than three (3) years without the written approval of all persons holding or otherwise owning any legal or equitable interest in said property; and provided further that such properties so reserved for public use as hereinbefore provided shall be exempt from all state, county and local taxes during such period; (5) the conservation of or production of adequate transportation, water, drainage and sanitary facilities; (6) the preservation of the location of and the volume and flow of water in and other characteristics of natural streams and other

waterways; (7) the avoidance of population congestion; (8) the avoidance of such scattered or premature subdivision of land as would involve danger or injury to health, safety or welfare by reason of the lack of water supply, drainage, transportation or other public services or necessitate an excessive expenditure of public funds for the supply of such services; (9) conformity of resubdivided lots to the character of lots within the existing subdivision with respect to area, frontage and alignment to existing lots and streets; (10) control of subdivision or building (except for agricultural or recreational purposes) in flood plain areas or streams and drainage courses, and on unsafe land areas; (11) preservation of outstanding natural or cultural features and historic sites or structures; or (12) other benefits to the health, comfort, safety or welfare of the present and future population of the regional district."

"16. Before preliminary approval may be granted for any subdivision plat the Planning Board must find that: sufficient public facilities and services exist or are programmed for the area. It is the intent of this section that public facilities and services should be adequate to preclude danger or injury to the health, safety and welfare and excessive expenditure of public funds.

"i. The Planning Board shall give due weight to the potential of the proposed subdivision in relation to the surroundings, including the nature, extent and size of the proposed subdivision; the estimated increase in population; the anticipated timing of the development of the land proposed for subdivision; and the degree of urbanization or development within a reasonable distance of the subject property; and the following factors:

"The availability of existing or programmed sewerage or water mains.

"The potential effect of the proposed subdivision on the efficient and economic operation of existing or programmed public facilities.

"The distance of any necessary extension of sewerage and water facilities through unsubdivided lands which are indicated for eventual development on an approved plan.

"The location of the proposed subdivision in respect to the approved Ten Year Water and Sewerage Plan, or in any future plan which designated the timing of construction of facilities.

"The availability of access roads adequate to serve traffic which would be generated by the subdivision, or the presence of a proposal for such road(s) on an adopted Master Plan and in the current Capital Improvement Program or the State Roads Commission program.

"The availability within a reasonable distance, and the adequacy of school, fire, police, utility, and park and recreation services."

The 31 acre tract of land (the property) with which we shall be concerned abuts the northwest side of the Pennsylvania Railroad which at that point serves also as one side of an equilateral triangle; the northeast side is the Capital Beltway (Interstate Rte 495); the south side is the John Hanson Highway (U.S. Rte 50). The property lies within the development known as West Lanham Hills which is about four miles northeast of the District line. Except for the land inside the triangle one can safely say the area surrounding the property is fully developed. Since 1964 the zoning classification of the property has been R-18 (Multiple Family, Medium Density, Residential), a classification with which the owner (appellee) seems content. It is said that a six acre strip has been or will be acquired to serve as the site for the Metro's Ardmore station.

In June 1971 the appellee submitted to the Commission for its approval, as required by the subdivision regulations, a

preliminary plan for the subdivision of two parcels of the property. The Commission referred the application to its staff which, in turn, sent it to various county agencies for review and comment. The Board of Education was one of the agencies whose comment was solicited. It referred the matter to its Office of Population Analysis. On 16 June the Office of Population Analysis sent a memorandum to F. Harris Allen, Principal Development Coordinator of the Commission. The memorandum indicated a "Projected Pupil Yield" of 134 for the West Lanham Hills Elementary School, the capacity of which was 640 and which, at the time, had an actual enrollment of 657.

Several weeks later there came into existence an "adequate public facilities check sheet" apparently prepared by someone on the Commission's technical staff. Allen said he used this "in the course of the review of preliminary plans." This check sheet, dated 6 July 1971, indicates that the property had a "potential" of 651 units and that, fully developed and occupied, it would yield 175.8 pupils. The Office of Population Analysis, it will be recalled, developed a figure of 134. The September 1970 enrollment at the West Lanham Hills Elementary School was stated, in the check sheet, to be 668 pupils or 11 more than the enrollment reported by the Office of Population Analysis. There appears also, in the check sheet, the following notation:

> "There are no additions in the CIP [Capital Improvements Program] which would increase the capacity of this school *or any other elementary schools in the vicinity.*"(Emphasis added.)

It is conceded that the technical staff of the Commission recommended approval of the appellee's application. It was considered by the Prince George's County Planning Board of the Commission on 9 August and disapproved the same day. A letter from Allen to the appellee, dated 13 August, states, in part:

> " ... West Lanham Hills Elementary School which would serve this property is currently

operating over its listed capacity and there are no plans for any elementary schools in the Capital Improvements Program which would relieve this situation. The property, if developed in accordance with the allowable density, would generate approximately 134 elementary school children which would further overload the existing school.

"It was therefore the opinion of the Planning Board that since adequate public facilities are neither existing or programmed to serve the area the proposed subdivision should be denied."

The record seems to suggest that during the next six or eight months counsel for the appellee tried, in vain as it turned out, to persuade the Commission to recede from the position it had taken in August. In March 1972 the Commission reaffirmed its unwillingness to approve the preliminary plan. On 26 May the appellee filed her petition praying the issuance of the writ of mandamus and a mandatory injunction commanding the Commission to approve her preliminary plan. The Commission answered and on 29 November the case came on to be heard before the trial judge, Meloy, J.

The appellee produced but one witness, James Panor, who has been the Assistant Population Analyst of the Board of Education since 1962. He said the six acre parcel to be acquired for the Metro station "was not considered in the analysis or the projection of pupil yield from the [appellee's] development." The subdivision plan proposed by the appellee for her 31 acres called for the development of two parcels:

Parcel "A" — 8.13 ± acres
Parcel "B" — 13.54 ± acres

Panor spoke of the conversion factors he used in making his projections. In cases where R-18 zoning prevails, he said, he multiplies the number of acres by 20 to determine the maximum number of units allowable. The result here, obviously, would be 8.13 + 13.54 x 20 or 433.40 units. While he did not say what factor he used to obtain the pupil yield

of 134 it would seem that three units could be expected to yield about one pupil.

When he testified in the court below he said that as of 29 September 1972 the enrollment at West Lanham Hills Elementary School was 551, 106 less than shown on his memorandum of 16 June 1971 to Allen. This, he said, "would be 89 pupils under its rated capacity." He agreed that if the projected yield of 134 pupils were reduced by 89, there would be only 45 pupils over and above the rated capacity of West Lanham Hills Elementary School. It will be recalled that the June 1971 memorandum indicates the enrollment was 17 over capacity (640).

Panor went on to testify that West Lanham Hills Elementary served one of four contiguous service areas, the others being served by Margaret Brent Elementary, Woodridge Elementary, and Landover Hills Elementary. Each of these three schools is about a mile, as the crow flies, from West Lanham Hills Elementary.

Panor's reply to the question set forth below is revealing:

> "Considering the existing facilities in these adjacent service areas would there be adequate facilities to meet the projected pupil yield? A. To meet the projected pupil yield, based on existing enrollments at the four elementary schools that I have presented here, and comparing that to the impact of the plan of subdivision and the projection, elementary pupils from the preliminary plan of subdivision, *there would be space to accommodate this number of children. . . .*" (Emphasis added.)

He went on to say that he had "totaled up the capacity of these [four] schools and it comes to 2,300; the enrollment as of September 29, 1972 is 2,049 *which means 251 children less than the capacity.*" (Emphasis added.)

Asked about the boundaries of the four service areas Panor replied:

> "Well, historically I would say since I've been

there and that is working for the superintendent's staff, boundaries for all schools that are involved in overcrowding are always considered for changes. ... And I would say that we have from year to year changed literally — practically all service areas of all existing schools.

"I might say when you build a school, a planned new school, to relieve a given community or a group of communities of overcrowding you must change boundaries. So for every school we have built boundaries have been changed of existing schools."

The Commission likewise produced but one witness, F. Harris Allen, identified early on as Principal Development Coordinator of the Commission. He testified the Planning Board had before it the check sheet prepared by the technical staff, but we have not found in the record any indication that the Planning Board had before it or that it considered or that it requested any other or further evidence in respect of the adequacy of school facilities. He stated unequivocally that the Board did not make "any finding other than what's recited in [his] letter [of 13 August to the appellee]." He agreed that the enrollment figure on the check sheet was "as of September 1970." He said the projected pupil yield of 175 was "the estimate of our office" and that it was based on "a potential yield of 651 units." He agreed also that a pupil yield of 175 was higher by 41 than Panor's figure. Asked to account for the difference he answered, "I can only assume that they took the entire tract [31 acres] and took no cognizance of the six acres which would have been going to Metro." Asked if what he stated in his letter of 13 August was the "only reason" for the Board's disapproval of the appellee's preliminary plan, he replied, "Correct." He agreed also that the technical staff had recommended the approval of the appellee's preliminary plan.

The Commission argues, with middling vigor, that Judge Meloy erred when he admitted, over objection, the testimony of Panor. Oddly enough no such argument is made in respect

of the admission of Allen's testimony. Much of Panor's testimony, says the Commission, had to do with facts "which were not offered to . . . [nor were] before the Commission at the time it denied" the appellee's application. The Commission cites a number of cases in support of its position but as the appellee points out they were concerned with appeals authorized by statute or within the purview of the Administrative Procedure Act, Code (1971 Repl. Vol.), Art. 41, §§ 244-256. From the Board's withholding of approval of a preliminary plan there seems to be no appeal. The Administrative Procedure Act does not apply, *Urbana Civic Ass'n v. Urbana Mobile Village, Inc.*, 260 Md. 458, 462, 272 A. 2d 628 (1971), and we have not been shown nor have we found any statute or ordinance permitting such an appeal. It should be observed that, in the circumstances of this case, the Board's decision, if allowed to stand, pretty well stymies any reasonable use of the property. That mandamus is available, however, is no longer open to question. *Urbana, supra; Maryland-National Capital Park and Planning Comm. v. Silkor Development Corp.*, 246 Md. 516, 229 A. 2d 135 (1967); *Town of District Heights v. County Comm'rs of Prince George's County*. 210 Md. 142, 122 A. 2d 489 (1956). Indeed, the Commission concedes that it is available. It insists, however, that Panor's testimony is inadmissible. Since we have said on a number of occasions that mandamus depends upon the facts, circumstances and conditions existing at the time the petition is filed, we think Judge Meloy quite properly let it in. *District Heights, supra.*

Nothing in the record suggests the Board held any kind of a hearing and Allen's testimony makes it quite clear that the only evidence or information before the Board when it denied the appellee's application was the check sheet sent up from the technical staff. All the Board could have learned from the check sheet was that last year's (September 1970) enrollment at West Lanham Hills Elementary was 28 pupils in excess of its capacity and that the property could yield 651 dwelling units. Neither figure agreed with the information furnished by Panor, and Allen agreed the 651 figure was incorrect. Indeed in his letter of 13 August 1971 he

abandoned the check sheet pupil yield of 175.8 and reverted to Panor's figure of 134. The Board could also have learned that an increase in the capacity of West Lanham Hills *"or any other elementary schools in the vicinity"* was not contemplated. What is meant by "vicinity" or which "other elementary schools" the staff had in mind is anyone's guess. We are not to be persuaded that the Board could have given "due weight . . . [to] [t]he availability within a reasonable distance, and the adequacy of school . . . services," in the light of such trivial and inaccurate evidence.

In *Baltimore Planning Commission v. Victor Development Co.*, 261 Md. 387, 275 A. 2d 478 (1971), we chose not to deal with the question whether the (Baltimore) Commission had "the power to formulate a rule dealing with the effect of subdivisions upon schools," although we hinted there might be some question about it. Here we choose not to deal with the question whether public schools are "public services" as that expression is used in the enabling act. The appellee urges that the principle of *ejusdem generis* should apply because of the juxtaposition of "public services" with "lack of water supply, drainage, transportation, or other public services," and it is, to be sure, not a wholly unattractive argument.

The subdivision regulation does not undertake to restrict pupils to the school within the boundaries of the service area in which they reside. The only limitation is that there must be an adequate school available "within a reasonable distance." Nor do the school authorities consider the boundaries of the service areas to be static and inflexible. Panor, it will be recalled, testified that they have "from year to year changed literally — practically all service areas of all existing schools." Reflecting upon Panor's testimony that the schools in the four contiguous areas have a capacity of 2,300 pupils and that the enrollment as of September 1972 was 251 less than capacity, one need not be especially perceptive to suppose that the area boundaries could readily be adjusted to take care of the 45 pupils said to be in excess of the capacity of West Lanham Hills Elementary School. One must, of course, assume the instant development and

occupancy of the appellee's project, but one need not assume that it has been in the R-18 classification since 1964. That is a fact. The regulation does not define "reasonable distance" but we do not think the Board can be heard to say that a mile, or even a mile and one-half, is not a "reasonable distance."

Since we are fully persuaded that the Board's refusal to approve the appellee's preliminary plan was arbitrary and capricious the order of the trial court will be affirmed.

*Order affirmed.*
*Costs to be paid by the appellant.*