762 A.2d 1012

### HOMES OIL COMPANY, INC.

v.

### MARYLAND DEPARTMENT OF THE ENVIRONMENT.

No. 2917, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Nov. 30, 2000.

444

David A. DuGoff, Chevy Chase, for appellant.

Jennifer L. Wazenski, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before HOLLANDER, THIEME * and ADKINS, JJ.

THIEME, Judge.

Appellant Homes Oil Company, Inc., appeals from the decision of the Circuit Court for Montgomery County granting summary judgment in favor of appellee, Maryland Depart-

---

* Thieme, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

ment of the Environment ("MDE"), pertaining to appellant's petition of appeal of MDE's administrative decision. Appellant presents the following question for review, which we have re-phrased and consolidated for clarity:

Did the trial court err in granting appellee's Motion for Summary Judgment regarding appellant's petition of appeal of MDE's administrative decision?

We answer "no" to this question and explain.

### Facts

Appellant owned and operated gas stations in Maryland, and was cited by appellee for oil contamination at two of its gas stations—one in Upper Marlboro and one in Hyattsville. Appellant was ordered to remedy these environmental concerns and implemented plans to do so. After successfully cleaning up the sites, appellant received notices of compliance from MDE for both sites.

In 1995, appellant applied to appellee for reimbursement of costs associated with the removal and off-site treatment of contaminated soil at these sites, pursuant to the Maryland Oil Contaminated Site Environmental Cleanup Fund ("Fund") of Title 4, subtitle 7 of the Environment Article. The Fund was created by the General Assembly in 1993 and amended in 1996. The parties agree that the 1996 amendment does not directly affect this case, as this action is based on events occurring prior to 1996. Following is a reproduction of the relevant portions of Title 4, subtitle 7 of the Environment Article, as it read prior to the 1996 amendment:

§ 4–701 provides relevant definitions:

(a) *In general.*—In this subtitle the following words have the meanings indicated.

(b) *Cleanup.*—"Cleanup" means abatement, containment, removal, and disposal of oil and the restoration of the environment.

(c) *Fund.*—"Fund" means the Oil Contaminated Site Environmental Cleanup Fund.

(d) *Oil.*—"Oil" has the meaning provided in § 4–401(g) of this title.

(e) *Site rehabilitation.*—

(1) "Site rehabilitation" means cleanup actions taken in response to a release from an underground oil storage tank.

(2) "Site rehabilitation" includes investigation, evaluation, planning, design, engineering, construction, or other services undertaken and expenses incurred to investigate or clean up affected soils, groundwater, or surface water.

(f) *Third party claim.*—"Third party claim" means any civil action brought or asserted by any person against any owner or operator of any underground oil storage tank for damages to person or property which damages are the direct result of oil released from tanks covered under this subtitle.

(g) *Underground oil storage tank.*—"Underground oil storage tank" has the meaning provided in § 4–401(k) of this title.

§ 4–702 provides legislative findings and intent:

(a) *Findings.*—The General Assembly finds and declares that:

(1) The storage of oil in underground oil storage tanks is a major cause of groundwater contamination in this State;

(2) Groundwater resources are vital to the population and economy of this State; and

(3) The preservation of the State's groundwater resources is in the public interest.

(b) *Additional Findings.*—The General Assembly further finds that where contamination of groundwater has occurred due to leaking underground oil storage tanks, remedial measures have often been delayed for long periods due to high costs of such remedial measures. These delays result in the continuation and intensification of the threat to the public health, safety, and welfare, in greater damages to the environment, and in significantly higher costs to clean up the contamination and rehabilitate the site.

(c) *Intent.*—The General Assembly intends this subtitle to provide adequate financial resources and incentives for the expeditious cleanup and rehabilitation of contaminated sites without delay.

§ 4–704 provides for the establishment of the fund:

(a) *Established.*—There is an Oil Contaminated Site Environmental Cleanup Fund.

(b) *Uses.*—The Fund shall be used to:

(1) Reimburse an owner or operator of an underground oil storage tank for site rehabilitation costs incurred on or after October 1, 1993 resulting from contamination caused by releases from an underground oil storage tank;

(2) Provide funds for site rehabilitation activities carried out by the Department or under the Department's direction and control; and

(3) To the extent provided in the State budget and in an amount not to exceed 3% of the revenues in the Fund during the fiscal year, provide funds for the Department's administration of this subtitle.

(c) *Exemptions from subtitle.*—The provisions of this subtitle do not apply to an underground storage tank that is:

(1) Exempt from the requirements of § 4–409(b)(3) of this title;

(2) Owned by a state, county, or municipal corporation; or

(3) Owned by a local education agency.

§ 4–705 is the reimbursement provision of the fund [1]:

(a) *Application.*—The owner or operator of an underground oil storage tank may apply to the Fund for reimbursement, on or after October 1, 1993, for usual, customary, and reasonable costs incurred on or after October 1, 1993 in performing site rehabilitation.

---

1. It should be noted that § 4–705 (particularly the deductible amounts) was heavily amended pursuant to the 1996 amendment, but our reproduction does not reflect any of those changes.

(b) *Deductibles; limitation.*—Any reimbursement from the Fund is subject to:

(1) For owners or operators of six tanks or fewer, a deductible of $15,000;

(2) For owners or operators of more than 6 but not more than 15 tanks, a deductible of $20,000;

(3) For owners or operators of more than 15 but not more than 30 tanks, a deductible of $30,000;

(4) For owners or operators of more than 30 tanks, a deductible of $40,000; and

(5) A limit of $125,000 per occurrence.

(c) *Eligibility.*—To be eligible for reimbursement from the Fund, an owner or operator shall:

(1) Certify that the discharge is not the result of a willful or deliberate act;

(2) Submit a corrective action plan, schedule, and cost estimate to the Department that shall include provisions for the environmentally sound treatment or disposal of contaminated soils that meet all federal and State requirements and standards; and

(3) Certify that the discharge is from a tank registered under § 4–411.1 of this title.

(d) *False certification.*—if the owner or operator knowingly submits a false certification under subsection (c) of this section, that owner or operator is not eligible for reimbursement under this subtitle.

(e) *Only cost-effective and reasonable expenses are eligible.*—Only expenses that are cost-effective, reasonable, and consistent with a corrective action plan approved by the Department may be eligible for reimbursement from the Fund.

(f) *Cost of replacing or retrofitting tanks not eligible.*—The cost for replacement or retrofitting of underground oil storage tanks and associated piping is not eligible for reimbursement, and the Department may not incur these costs or expend moneys from the Fund for these purposes.

In 1994, MDE adopted in Title 26, Subtitle 10, Chapter 14 of the Code of Maryland Regulations ("COMAR") regulations to assist in the Fund's implementation.[2] MDE established a method to prioritize applicants to the Fund based upon environmental risk and the total amount of an applicant's underground storage tanks within Maryland. The most relevant provision of COMAR to the dispute in this case is 26.10.14.05, which includes a schedule of eligible reimbursement costs:

A. The Department shall reimburse an applicant only for the following site rehabilitation costs if they are cost effective, reasonable, and consistent with an approved application:

(1) Soil handling, including excavation, transportation, and proper disposal—up to $20 per ton up to 100 tons per site;

(2) Soil treatment—up to:

(a) $30,000 per installation,

(b) $10,000 per year for operation and monitoring;

(3) Ground water pumping and treatment, and soil treatment—up to:

(a) $45,000 per installation,

(b) $17,500 per year for operation and monitoring;

(4) Ground water pumping and treatment, and soil treatment—up to:

(a) $55,000 per installation,

(b) $17,500 per year for operation and monitoring;

(5) Well bailing or monitoring, or both,—up to $12,500 per year for operation;

(6) Subsurface investigation—up to $8,000.

---

**2.** Portions of Chapter 14 were amended, effective 1997; these amendments are not relevant in this case, as the parties have agreed that the events that took place predate the amendment.

B. The Department may approve other site rehabilitation costs for reimbursement if it determines the costs are for effective and necessary site rehabilitation activities.

COMAR, Title 26, Subtitle 10, Chapter 14

Appellant claims that it "excavated and treated 2,131 tons of contaminated soil from the Upper Marlboro site ... at a cost of over $105,000" and that it "excavated and treated 3,517 tons of contaminated soil from the Hyattsville site ... at a cost of over $175,000." Interpreting its own regulations, MDE determined that the costs in question were for "soil handling" and "soil treatment," and reimbursed appellant $32,263.08 for the Upper Marlboro site and $36,410.01 for the Hyattsville site. These amounts were established primarily as a result of the maximum allowable reimbursement limits for "soil handling" and "soil treatment" under § .05A of COMAR 26.10.14.

Appellant, dissatisfied with the amount of the reimbursement provided by appellee, requested that MDE reconsider its determination and provide it with additional reimbursement under § .05B of COMAR 26.10.14 for "other site rehabilitation costs for reimbursement" that appellant claimed were "for effective and necessary site rehabilitation activities." MDE rejected appellant's request, stating in a letter to appellant that it believed "that additional reimbursement would be beyond the cost allowed in the current regulations" and that "[t]he Department has reimbursed you under COMAR 26.10.14.05A(1) and A(2) for soil removal and treatment. COMAR 26.10.14B applies to rehabilitation costs not listed under Regulation .05A...." Appellant subsequently filed a notice of appeal with MDE. In response, MDE stated that "it would be inappropriate to allocate additional funds. Under COMAR 26.10.14.04D, this decision is final regarding reimbursement matters."

Appellant then filed a petition in the Circuit Court for Montgomery County requesting judicial review of MDE's reimbursement decision pursuant to applicable provisions of the Administrative Procedure Act ("APA"), or, in the alternative, a writ of mandamus ordering MDE to pay additional

reimbursements. Ultimately, the circuit court did not rule on the motion regarding the mandamus petition but remanded the case to MDE for the issuance of a written decision outlining MDE's specific findings of facts and conclusions of law upon which it had based its denial of additional reimbursements. MDE then appealed the circuit court's decision to remand the case. In an unreported opinion, Judge Rosalyn B. Bell wrote for this Court, holding that appellant did not have the right to judicial review under the APA, and that its petition for mandamus failed to state a claim upon which relief could be granted. Regarding the right to judicial review under the APA, we stated that "we hold that § 4–412(b) grants APA judicial review only for MDE decisions issued pursuant to Subtitle Four, Title Four of the Environment Article." Pertaining to appellant's petition for mandamus, we allowed for the filing of an amended petition for mandamus, as we stated:

> [Appellant's] allegations are much too sparse and conclusory to support a claim that MDE officials acted arbitrarily and capriciously. Thus, Homes cannot be allowed to proceed on that pleading; if it wants review of MDE's reimbursement decision, it will have to re-file a pleading which contains more specific allegations entitling it to relief.

*Maryland Department of the Environment v. Homes Oil Company, Inc.,* No. 541, September Term, 1997, 122 Md.App. 789 (filed July 24, 1998) (per curiam).

Appellant subsequently filed an amended complaint in mandamus. MDE responded by filing a motion for summary judgment on the ground that its reimbursement decisions were consistent with the reasonable interpretation of its own regulations. MDE's motion for summary judgment was granted by the circuit court. Appellant then moved to alter or amend the judgment; appellant's motion was denied. This appeal followed.

It is appellant's contention that the circuit court erred in granting appellee's motion for summary judgment when material facts were in dispute. Pursuant to Md. Rule 2–501(e),

"[t]he court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md.Rule 2–501(e). *See, e.g., Murphy v. Merzbacher,* 346 Md. 525, 531, 697 A.2d 861 (1997); *Bowen v. Smith,* 342 Md. 449, 454, 677 A.2d 81 (1996); *Rosenblatt v. Exxon Company, U.S.A.,* 335 Md. 58, 68, 642 A.2d 180 (1994); *McGraw v. Loyola Ford, Inc.,* 124 Md.App. 560, 572, 723 A.2d 502, *cert. denied,* 353 Md. 473, 727 A.2d 382 (1999).

 In order for there to be disputed facts sufficient to render summary judgment inappropriate, "there must be evidence on which the jury could reasonably find for the plaintiff." *Seaboard Sur. Co. v. Richard F. Kline, Inc.,* 91 Md.App. 236, 244, 603 A.2d 1357 (1992). This Court has held that "[c]onclusory denials or bald allegations will not defeat a motion for summary judgment." *Barber v. Eastern Karting Co.,* 108 Md.App. 659, 672, 673 A.2d 744, *cert. denied,* 343 Md. 334, 681 A.2d 69 (1996); *see Seaboard Sur. Co.,* 91 Md.App. at 243, 603 A.2d 1357. Moreover, "a mere scintilla of evidence in support of the non-moving party's claim is insufficient to avoid the grant of summary judgment." *Barber,* 108 Md.App. at 672, 673 A.2d 744 (citing *Beatty v. Trailmaster Products, Inc.,* 330 Md. 726, 738, 625 A.2d 1005 (1993)).

Appellant contends that an actual controversy does exist on two issues: 1) whether MDE's handling of appellant's reimbursement applications to the Fund was arbitrary and capricious, because MDE limited reimbursement to the amounts specified in Section A of COMAR 26.10.14.05, and refused to reimburse appellant under Section B of that statute for other remediation costs;, and 2) whether COMAR 26.10.14.05 is invalid because it provides incentive for applicants to delay clean-up of oil contaminated sites, contrary to the legislative intent. By contrast, MDE asserts that the motion for summary judgment was properly granted because there was no dispute as to any facts, as its reimbursement decisions were consistent with the reasonable interpretation of its own regu-

lations. We agree with MDE, and find no merit in appellant's argument.

### Writ of Mandamus

The method of review in this case is by means of a writ of mandamus. Therefore, we shall first address the threshold question of whether this Court has the authority to issue the extraordinary writ of mandamus under the circumstances of this case. "The common law writ of mandamus is an original action and not an appeal." *Philip Morris Inc., et al. v. The Honorable Edward J. Angeletti*, 358 Md. 689, 707, 752 A.2d 200 (2000). *See Board of License Commissioners for Anne Arundel County v. Corridor Wine, Inc., t/a Corridor Wine & Spirits, et al.*, 361 Md. 403, 411, 761 A.2d 916 (2000), slip opinion at 8. A writ of mandamus "is a summary remedy, for the want of a specific one, where there would otherwise be a failure of justice. It is based upon reasons of justice and public policy, to preserve peace, order and good government." *Id.* at 708, 752 A.2d 200 (citations omitted). "[T]he authority to issue mandamus rests within the sound discretion of the court, but that discretion must 'be exercised under the rules long recognized and established at common law.'" *Id.* (citation omitted). "We have acknowledged that the power to issue an extraordinary writ of mandamus is one which ought to be exercised with great caution." *Doering v. Fader*, 316 Md. 351, 361, 558 A.2d 733 (1989). Although the Maryland Constitution only provides circuit courts with statutory authority to grant mandamus, the Court of Appeals has stated that "we have jurisdiction to issue to an inferior court peremptory writs in aid of our appellate jurisdiction." *Philip Morris*, 358 Md. at 710–11, 752 A.2d 200. In support of this conclusion, the Court stated:

Whether we have, as the highest court of this State, an inherent superintending or supervisory power over the courts below us in the judicial hierarchy, and whether any such power is implicit in Article IV, § 18 of the Maryland Constitution, are questions we reserve for another day. We need not and do not address them today because we hold

that under the circumstances of this case we have the power to issue a writ of mandamus or a writ of prohibition in aid of our appellate jurisdiction.

*Id.* at 710, 752 A.2d 200.

The *Philip Morris* Court explained that mandamus is in aid to appellate jurisdiction when the use of it is necessary to enable the Court to exercise appellate jurisdiction. *Id.* at 711, 752 A.2d 200. The Court explained that mandamus aided the appellate process "by making possible the review of a potentially unreviewable question." *Id.* For similar reasons, it is within the purview of this Court to issue writs of mandamus. *See Bozeman v. Disability Review Bd. of the Prince George's County Police Pension Plan,* 126 Md.App. 1, 727 A.2d 384 (1999).

In Maryland common law mandamus has been described as a prerogative writ grantable where the public justice of the State is concerned. It is a writ to prevent disorder, from a failure of justice, where the law has established no specific remedy, and where in justice and good government there ought to be one....

*In re Writ of Prohibition,* 312 Md. 280, 307, 539 A.2d 664 (1988) (citation omitted) (inner quotation marks omitted). A writ of mandamus will only be issued in *extraordinary cases* where that "action is necessary to protect its jurisdiction or accomplish substantial justice." *Philip Morris,* 358 Md. at 718, 752 A.2d 200. The Court ultimately granted mandamus in *Philip Morris,* stating:

We simply hold that, given the irreparable harm that might otherwise be suffered by the legal system and by Petitioners, we may issue a writ of mandamus in aid of our appellate jurisdiction in the present matter. It is appropriately within this Court's prerogative to review the order of the Circuit Court granting class certification in this case so extraordinary because of the immense amount of time and expense that both the parties and the judicial system of this State will incur should the litigation proceed as a class action, as well as the astronomical number of persons in

Maryland whose lives will be affected by our decision either way.

*Id.* at 722, 752 A.2d 200.

██ In *Goodwich,* the Court of Appeals stated that "judicial review is properly sought through a writ of mandamus 'where there [is] no statutory provision for hearing or review and where public officials [are] alleged to have abused the discretionary powers reposed in them.'" *Id.* at 146, 680 A.2d 1040 (quoting *State Department of Health v. Walker,* 238 Md. 512, 522–23, 209 A.2d 555 (1965)).[3] "Thus, prior to granting a writ of mandamus to review discretionary acts, there must be both a lack of an available procedure for obtaining review and an allegation that the action complained of is illegal, arbitrary, capricious or unreasonable." *Goodwich,* 343 Md. at 146, 680 A.2d 1040. In *Prince George's County v. Carusillo,* 52 Md. App. 44, 50, 447 A.2d 90 (1982), we stated, "the writ will lie if no statutory provision for a hearing or review exists *and* public officials are alleged to have abused their discretion." (Emphasis added.)

Regarding the first point of this two-step analysis, the Court of Appeals has stated that "[i]t is well settled in this State that a writ of mandamus will not be granted where the petitioner has a specific and adequate legal remedy to meet the justice of the particular case and where the law affords [another] adequate remedy." *Brack v. Wells,* 184 Md. 86, 90–91, 40 A.2d 319 (1944); see also *Gisriel v. Ocean City Elections Board,* 345 Md. 477, 497, 693 A.2d 757 (1997). Our earlier unreported opinion in this case stated that there was no method of review available to appellant other than mandamus. We will not now disturb that determination. Therefore, appellant has met the first criteria, but, in order for mandamus to be appropriate under the facts of this case, appellant must also demonstrate

---

**3.** The *Walker* Court further stated that "decisions contrary to law or unsupported by substantial evidence are not within the exercise of sound ... discretion, but are arbitrary and illegal acts." *Walker,* 238 Md. at 523, 209 A.2d 555.

that the second criteria has been met, namely, that MDE acted arbitrarily or capriciously.[4]

We find that MDE did not act arbitrarily or capriciously in making its determination, and, therefore, we decline to grant mandamus. Subsequently, we affirm the circuit court's decision granting summary judgment in favor of MDE.

In *Goodwich,* our Court of Appeals opined:

Our mandamus jurisprudence is illustrated both by those cases in which we have granted the writ, as well as those in which we have refused to issue it. For example, in *Maryland–National Capital Park and Planning Commission v. Rosenberg,* 269 Md. 520, 307 A.2d 704 (1973), we held that mandamus relief was appropriate because there was no statutory provision for judicial review and because the Planning Commission acted arbitrarily and capriciously in refusing to approve a plan for the subdivision of a piece of property. *Id.* at 529–31, 307 A.2d at 708–10. In [*State Dept. of Health v.*] *Walker, supra,* [238 Md. 512, 209 A.2d 555 (1965)] mandamus was granted in the absence of provision for hearing or review and where the issuance of sewage disposal permits was arbitrarily denied. 238 Md. at 522–23, 209 A.2d at 561. In *Heaps [v. Cobb], supra,* [185 Md. 372, 45 A.2d 73 (1945)] again we found mandamus relief warranted in the absence of provision for judicial review and where the Board of Trustees of the Employees' Retirement System arbitrarily denied a pension claim by a member's widow. 185 Md. at 379–86, 45 A.2d at 76–79.

In *Bovey [v. Executive Director], supra,* [292 Md. 640, 441 A.2d 333 (1982)] the petitioners sought a writ of mandamus to compel the Director of the HCAO to inquire of potential arbitration panelists whether they had an economic relation-

---

4. In our prior unreported opinion in this case, quoting *Goodwich,* we stated, "judicial review is properly sought through a writ of mandamus 'where there [is] no statutory provision for hearing or review and where public officials [are] alleged to have abused the discretionary powers reposed in them.' " *Goodwich,* 343 Md. at 146, 680 A.2d 1040 (quoting *Walker,* 238 Md. at 522–23, 209 A.2d 555).

ship with the health care providers whose cases they would be deciding. We denied relief on the basis that the Director was free to exercise discretion in assuring the impartiality of panelists; therefore, mandamus would not lie to compel him to follow a specific procedure. 292 Md. at 649, 441 A.2d at 338. We also stated that judicial review existed to correct any such errors on the Director's part. *Id.* In *Stark v. State Board of Registration*, 179 Md. 276, 19 A.2d 716 (1941), we refused to grant mandamus relief to a petitioner who sought to compel the Board of Registration for Professional Engineers and Land Surveyors to issue a license to him, because the record contained no evidence that the Board failed to act or acted arbitrarily and, more importantly, because he failed to exhaust his statutory right of review. *Id.* at 283–85, 19 A.2d at 719–20.

*Goodwich,* 343 Md. at 147–48, 680 A.2d 1040.

In *Heft v. Md. Racing Comm'n,* 323 Md. 257, 274, 592 A.2d 1110 (1991), the Court of Appeals stated:

Under our decisions, this is an administrative exercise of judgment which is not controllable by mandamus. *Bovey v. Exec. Dir., Health Claims*, 292 Md. 640, 649, 441 A.2d 333, 338 (1982) ("the Director is to bring his sound judgment" in applying certain statutory criteria, and, therefore, "[m]andamus simply does not lie"); *Brack v. Bar Association*, 185 Md. 468, 474, 45 A.2d 102, 105 (1945) (mandamus "will not be issued if the ... duty .... [be] of a nature to require the exercise of judgment"); *Brack v. Wells*, 184 Md. 86, 90, 40 A.2d 319, 321 (1944) ("When an act depends upon ... judgment, the writ of mandamus will not lie"); *Fooks v. Purnell*, 101 Md. 321, 323, 61 A. 582 (1905) ("when a matter is confided to the ... judgment of a tribunal or official, no writ of mandamus would lie ... to reverse a decision made in pursuance thereof").

*Heft,* 323 Md. at 274, 592 A.2d 1110.

The *Heft* Court stated that the judgment of an administrative agency is not controllable by mandamus when,

as in the present situation, it "involves the application of somewhat complex regulatory standards to the facts of a particular situation." *Id.* "A court cannot substitute its discretion for the discretion of the [Department] where there is evidence that reasonably justifies the [Department's] finding, even though the court may disagree with the [Department]." *Id.* at 273, 592 A.2d 1110. This Court can only disturb an agency's decision if it is limited to correcting errors of law and determinations which were arbitrary, capricious, or unsupported by substantial evidence. *Id.*

"Mandamus is an original action, as distinguished from an appeal." 52 Am.Jur.2d Mandamus § 4 (1970) (footnote omitted). It is "not a substitute for appeal or writ of error." *In re Petition for Writ of Prohibition*, 312 Md. 280, 306, 539 A.2d 664, 676 (1988). It is, however, "an extraordinary remedy[,]" *Ipes v. Board of Fire Commissioners of Baltimore*, 224 Md. 180, 183, 167 A.2d 337, 339 (1961), "that . . . will not lie if [there is] any other adequate and convenient remedy[.]" *A.S. Abell Co. v. Sweeney*, 274 Md. 715, 718, 337 A.2d 77, 79 (1975) (quoting *Applestein v. Baltimore*, 156 Md. 40, 45, 143 A. 666, 668 (1928)). Mandamus is generally used "to compel inferior tribunals, public officials or administrative agencies to perform their function, or perform some particular duty imposed upon them which in its nature is imperative and to the performance of which duty the party applying for the writ has a clear legal right." *Criminal Injuries Compensation Board v. Gould*, 273 Md. 486, 514, 331 A.2d 55, 72 (1975); see also *George's Creek Coal & Iron Co. v. County Commissioners*, 59 Md. 255, 259 (1883). The writ ordinarily does not lie where the action to be reviewed is discretionary or depends on personal judgment. *Board of Education of Prince George's County v. Secretary of Personnel*, 317 Md. 34, 46, 562 A.2d 700, 706 (1989); *In re Petition, supra,* 312 Md. at 305–06, 539 A.2d at 676; see also *Tabler v. Medical Mutual Liability Insurance Society*, 301 Md. 189, 202 n. 7, 482 A.2d 873, 880 n. 7 (1984); *Bovey v. Executive Director, HCAO,* 292 Md. 640, 646, 441 A.2d

333, 337 (1982); *Maryland Action for Foster Children v. State*, 279 Md. 133, 138–39, 367 A.2d 491, 494 (1977).

*Goodwich*, 343 Md. 130, 145, 680 A.2d 1040 (1996).

Appellant reliance on cases dealing with the appropriate standard of review is misplaced. Appellant cites *White v. North*, 121 Md.App. 196, 219, 708 A.2d 1093 (1998). That case was *reversed and remanded* by the Court of Appeals in *White v. North*, 356 Md. 31, 736 A.2d 1072 (1999). That case, which did not involve a writ of mandamus, is inapposite to the instant case, as the Court of Appeals discussed only judicial review of *zoning* matters and applied a "fairly debatable" test. Moreover, appellant apparently loses sight of the fact that mandamus can be granted only if MDE acted arbitrarily, capriciously, or contrary to law. Any error short of this standard does not call for the granting of appellant's mandamus.

## *Discussion*

Having articulated the appropriate rule of law, we proceed to the substance of appellant's claims. We observe that, where the classification of appellant's costs was completely within MDE's discretion, we should not substitute our expertise for that of an agency interpreting its own regulations. "Upon appellate review, courts bestow special favor on an agency's interpretation of its own regulation." *Dept. of Health and Mental Hygiene v. Reeders Memorial Home*, 86 Md.App. 447, 453, 586 A.2d 1295 (1991). Recognizing an agency's superior ability to understand its own rules and regulations, a "court should not substitute its judgment for the expertise of those persons who constitute the administrative agency from which the appeal is taken". *Id.* (quoting *Bulluck v. Pelham Wood Apartments*, 283 Md. 505, 513, 390 A.2d 1119 (1978)).

Appellant contends that the manner in which MDE applied its regulations was arbitrary, capricious and contrary to law. In order to disturb MDE's decision, we would have to find this contention to be true. In *Hurl v. Board of Education*, 107 Md.App. 286, 305, 667 A.2d 970 (1995), this Court stated:

In order to determine whether the appellant sufficiently alleged facts of "arbitrariness and capriciousness," we first must define what is meant by those terms. "Decisions contrary to law or unsupported by substantial evidence are not within the exercise of sound administrative discretion, but are arbitrary and illegal acts." *Department of Health v. Walker*, 238 Md. 512, 523, 209 A.2d 555 (1965). See also *Hackley v. City of Baltimore*, 70 Md.App. 111, 116, 519 A.2d 1354 (1987). BLACK'S LAW DICTIONARY (6th ed.1990) (citations omitted) defines the term "arbitrary" as including something done "without adequate determining principle," "nonrational," and "willful and unreasoning action, without consideration and regard for facts and circumstances presented"; and the term "arbitrary and capricious" as "willful and unreasonable action without consideration or in disregard of facts or law or without determining principle."

*Hurl*, 107 Md.App. at 306, 667 A.2d 970.

In *Hurl*, we were addressing whether the Board of Education's actions had been arbitrary and capricious. We stated that "the State Board regulations define decisions of a county board as being 'arbitrary' where 'contrary to sound educational policy' and/or where a 'reasoning mind could not have reasonably reached the conclusion the county board reached.'" *Id.* In that case, we were unable to find any evidence that the Superintendent acted arbitrarily or capriciously in any way in transferring appellant, a veteran teacher. We stated, "First, appellant has not shown, nor have we found, anything to indicate that a superintendent is forbidden from making a transfer decision based on his subjective professional judgment. Second, even if his or her subjective rationale is without merit, that does not mean the decision is arbitrary." *Id.* at 309, 667 A.2d 970. We also stated that appellant "had been given reasons for her transfer. Although the reasons were not to her liking, this does not make the decision itself arbitrary." *Id.* at 310, 667 A.2d 970.

Similarly, in the case *sub judice*, we find no implication that the agency (in this case MDE) acted arbitrarily,

capriciously, or illegally. Our review indicates that MDE acted reasonably within its administrative discretion. From the record before us, we find no reason to believe that MDE acted unreasonably or without consideration and regard for the facts and circumstances presented in this case. In our prior unreported opinion in this case, we stated that appellant's pleading was "much too general to support a mandamus claim." We recognized appellant's allegations that MDE's refusal to grant all of the requested reimbursement was "unsupported by competent, material and substantial evidence ... is in direct conflict with the clearly expressed intent of the legislature ... exceeds the authority granted by the Statute ... is unreasonable in light of all of the facts and circumstances...." Nonetheless, we found that appellant's "allegations are much too sparse and conclusory to support a claim that MDE officials acted arbitrarily and capriciously."

We reach the same conclusion today. MDE reviewed appellant's reimbursement request. It decided to reimburse appellant an amount that it found to be correct and appropriate according to the relevant statute and the regulations it had adopted in furtherance of that statute. It responded to appellant's letters, and at all times provided appellant with a consistent explanation as to how the reimbursement amounts were determined in this case. MDE's findings and interpretations in this case appear sensible, logical and wholly based on the applicable rules and regulations. Nowhere do we find any reason to believe that MDE acted arbitrarily or capriciously. MDE's decision was ultimately decided based on its discretion whether to include appellant's costs under § .05B, and we will not disturb that finding.

Appellant's applications to the Fund for the two subject sites were approved in 1994 and 1995, thus subjecting this situation to the applicable statute as it was written prior to the 1996 amendment.[5] The maximum reimbursement amount for any site was, and is, $125,000. Appellant owned and operated

---

5. Neither party contends otherwise, and, in fact, the timing of the events in this case justify this finding.

more than thirty underground storage tanks within Maryland; therefore, pursuant to the statute, the applicable deductible for each site was $40,000. As a result, the maximum reimbursable amount for each site was $85,000. This amount was then subject to the application of the category limits as detailed in § .05A. According to § .05A, a maximum of $2,000 for soil handling and a maximum of $30,000 for soil treatment could be awarded to appellant at each site.

MDE's determination of what type of costs appellant had incurred was dispositive as to how much reimbursement appellant would be entitled. Appellant contends that it should be reimbursed additional expenses under § .05B because its costs represented "other site rehabilitation costs," and thus should not have been subjected to the limitations imposed by § .05A. Appellant correctly states that, had MDE not classified appellant's expenses under § .05A, appellant's expenses may have been covered instead by § .05B, which provides for much more liberal reimbursement.

Section .05B provided that "the Department *may* assess other site rehabilitation costs for reimbursement *if it determines* the costs are for effective and necessary treatment." (Emphasis added.) MDE contends that, "even assuming that [appellant's] costs qualified for consideration under [§ .05B], the relief [appellant] seeks is simply beyond the reach of mandamus, because it would require the court to substitute its discretion for that of [MDE]." MDE argues that "the permissive language of [§ .05B] conveys broad discretion to [MDE] in determining whether and, if so, how much reimbursement to award an applicant for qualifying costs."

On the other hand, Appellant argues:

Section .05B may reasonably be read as a "savings clause" that not only applies to activities not listed in § .05A, but also supplements "other costs" incurred in connection with the listed activities. So read, the regulations would provide reasonable reimbursement where site conditions demand or permit unusual or innovative treatment methods, even if they also involve activities listed in § .05A.

Appellant attempts to convince us that its activities "listed in § .05A" should nonetheless be interpreted to qualify for reimbursement under § .05B because they involve "unusual or innovative methods." Applying this argument, appellant contends that its off-site bioremediation should not be classified as "soil treatment" under the statute, and thus should be considered under § .05B.

MDE addresses this contention in its brief, replying that § .05A(1) "deals expressly with excavation, transportation, and proper disposal ... [t]hese activities by their very nature encompass the removal of soil from the site ... § .05A(2) is entirely neutral as to the location at which soil treatment takes place ... [f]inally, the term 'on-site' appears nowhere in either provision." MDE further explains that appellant's treatment of the soil was not distinct from the soil treatment described in § .05A. MDE asserts that its interpretation of the term "soil treatment" does *not* exclude the bioremediation method used by appellant, that the soil was treated at a facility licensed by MDE, and that bioremediation is one of several methods used by the licensed facilities to treat oil contaminated soil. Consequently, MDE contends that there is no merit to appellant's argument that its soil treatment was not performed pursuant to § .05A, nor that it used "unusual or innovative treatment methods." We agree.

Appellant asserts that MDE's interpretation of the statute is illogical and "unfathomable," and takes particular exception to § .05A(1), which limits reimbursement for soil handling activities to "up to $20 per ton up to 100 tons per site," or $2,000. Appellant argues that "[a] rationale for the $2,000 limit does not appear on the face of the regulation" and that "[t]here has been *no* finding by the Agency that $20 per ton is the usual, customary, or reasonable cost for soil handling."

Appellant's contentions are simply not persuasive. This Court is not the proper forum for appellant's disagreement with the rationale and purpose of specific provisions of the applicable regulation. Such concerns are not for the courts to address. Instead, appellant may wish to direct its

dissatisfaction with the practical consequences of this statute to the legislature, thereby possibly working toward less costly clean-up efforts in the future. COMAR 26.10.14.05 was a regulation established by MDE for purposes of implementing the legislative intent of the Fund that was set forth by the General Assembly in Title 4, subtitle 7 of the Environment Article. Appellant's contention that MDE's regulations are not effective at encouraging expeditious cleanups is beyond the proper scope of our review.[6]

> This power of review, whether authorized by statute or assumed inherently, cannot be a substitution of the court's judgment for that of the agency. In those instances where an administrative agency is acting in a manner which may be considered legislative in nature (quasi-legislative), the judiciary's scope of review of that particular action is limited to assessing whether the agency was acting within its legal boundaries.

*Fogle v. H & G Restaurant,* 337 Md. 441, 454, 654 A.2d 449 (1995).

> State agencies often perform functions that are legislative in nature. Promulgation of new regulations by agencies is one of these so-called quasi-legislative activities. The regulation at issue in the instant case was adopted by way of the rule-making process. Agency regulations must be consistent with the letter and the spirit of the law under which the agency acts. Furthermore, while it is well-settled that there must be sufficient guidance given when legislative authority is delegated to agencies, we have held that "the modern tendency of the courts is toward greater liberality in permitting grants of discretion to administrative officials in order to facilitate the administration of laws as the

---

**6.** Appellant argues that "the regulation is inconsistent with both the General Assembly's stated intent and the statute's standards for reimbursement." Appellant also claims that "the regulation must be struck as invalid because the Agency may not legislate under the guise of rule making by issuing a regulation which is inconsistent with or out of harmony with, or which alters, adds to, extends or enlarges, subverts, impairs, limits, or restricts the act being administered."

complexity of governmental and economic conditions increase."

*Id.* at 453, 654 A.2d 449 (citations omitted) (footnotes omitted).

The "substantial evidence" standard of judicial review, as set forth in § 215(c)(2), namely, whether a reasoning mind could have reached the factual conclusion the agency reached, is inapplicable as our prior cases indicate where the agency is acting in a quasi-legislative mode in considering and adopting regulations within the boundaries of its rule-making authority. See also *Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686, 711, 376 A.2d 483 (1977). It is thus "not the function of the courts to pass upon the wisdom of the regulation, or to approve or disapprove it, if it does not exceed constitutional limits." *Givner v. Commissioner of Health*, 207 Md. 184, 192, 113 A.2d 899 (1955).

*Id.* at 456, 654 A.2d 449.

In any event, our reading of the relevant legislation indicates that the legislature did not intend to provide contaminators with *full* reimbursement in their clean-up efforts. It appears that the Fund is a means of subsidizing a portion of the clean-up costs associated with underground storage tanks; nowhere is it stated or implied that this Fund should provide contaminators with *full* reimbursement for their clean-up efforts. The Fund was established to provide assistance and *adequate* financial resources for these clean-up efforts. We are somewhat troubled by appellant's assertions, as appellant too readily finds that it is *entitled* to reimbursement for merely *obeying the law.* We note that there exist a multitude of laws within our society that require citizens and corporations to spend large amounts of money in order to comply with numerous social policies, without any provisions for any type of government reimbursement. Aside from reimbursement for clean-up costs, the contaminator's desire to be environmentally responsible, to abide by the laws of the State, and to increase the marketability of its property seem to be strong

encouragement for companies in this predicament to "clean up."

Appellant points out that the 100–ton limit imposed by this legislation pertaining to soil handling activities was eliminated in the 1996 amendment to this statute. This amendment was established to be effective prospectively, for applications filed after July 1, 1996, and therefore does not affect the case *sub judice*. Appellant argues, however, that the amendment itself indicates MDE's acknowledgment that the 100–ton limit was inappropriate. We do not assess whether this contention is true and find it to be irrelevant. The limit was in effect during the critical time pertaining to the facts of this case. MDE had undoubtedly imposed this limit, as well as the other limits within this legislation, in order to be certain that enough money would be available to assist a larger number of applicants. Therefore, the limit was directly related to the intent, and we do not concern ourselves with the fact that MDE saw it necessary at a later time to eliminate this limit.

Appellant contends that "the regulation can be harmonized with the statute by reading § .05B to include *costs* not covered by § .05A which are for effective and necessary activities, regardless of whether the particular *activities* are also listed in § .05A." Appellant argues that, "[b]y giving § .05A preclusive effect, the Agency effectively renders § .05B a nullity, since § .05A covers just about every activity involved in site rehabilitation." Appellant states that "[t]here is hardly any activity left that can possibly qualify for § .05B, if B only applies to other 'activities.'" It asserts that MDE should have looked outside of § .05A because its rehabilitation system was innovative and not contemplated by the regulations. It also posits that § .05B is a savings clause and should have been applied in this case, and that MDE's refusal to do so was "an abuse of discretion based on its illegal interpretation of the regulation."

Appellant further asserts that MDE's interpretation of the regulation is inconsistent with the legislature's stated intent, and that the regulation, as interpreted by MDE, disadvan-

tages an applicant, who, like appellant, rehabilitates its site expeditiously, because the benefits under the statute are reduced when an applicant rehabilitates its site within one year. It avers that this is the case because, if an applicant completes the clean-up within one year, the applicant would not be eligible for the full statutory benefit of $125,000. We find this argument without merit. Appellant completely and erroneously rules out the possibility that an applicant would receive reimbursement under § .05B for additional activities not listed in § .05A, therefore providing the applicant with a means of receiving additional reimbursement above and beyond what is allowable within § .05A. Thus, an applicant could indeed be reimbursed up to the limit of $125,000 per occurrence, provided the appropriate deductible is paid.

MDE's response to these contentions is that § .05B provides reimbursement only for site rehabilitation activities not identified in § .05A. As we have stated, the language in § .05B, as it was written prior to the 1996 amendment, provided: "The Department may approve other site rehabilitation costs for reimbursement if it determines the costs are for effective and necessary site rehabilitation activities." We find that MDE's interpretation of the statute appears to be in line with the legislative intent. As the Court of Appeals recently stated in *Sacchet v. Blan*, "the cardinal rule of statutory construction is to ascertain and give effect to the true legislative intent that lies behind the statutory enactment itself." 353 Md. 87, 92, 724 A.2d 667 (1999); *see also Catonsville Nursing v. Loveman*, 349 Md. 560, 570, 709 A.2d 749 (1998); *Jones v. State*, 311 Md. 398, 405, 535 A.2d 471 (1988). To determine the legislative intent, we primarily look to "the plain language of the statute, with the words given their ordinary and natural meanings." *Sacchet*, 353 Md. at 92, 724 A.2d 667; *see also Whack v. State*, 338 Md. 665, 672, 659 A.2d 1347 (1995).

When the words in a statute could be given more than one meaning, "the court may consider the consequences resulting from one meaning, rather than another, and adopt

the construction that promotes the most reasonable result in light of the objectives and purpose of the enactment." *Fox v. Comptroller of the Treasury,* 126 Md.App. 279, 285, 728 A.2d 776, *cert. denied,* 355 Md. 612, 735 A.2d 1106 (1999) (citing *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730 (1986)). "[A]ll sections ... must be read together, in conjunction with one another, to discern the true intent of the legislature." *Philip Electronics North America, et al. v. Wright,* 348 Md. 209, 216, 703 A.2d 150 (1997); *see also Vest v. Giant Food Stores, Inc.,* 329 Md. 461, 466–67, 620 A.2d 340 (1993); *Ryder Truck Lines v. Kennedy,* 296 Md. 528, 537, 463 A.2d 850 (1983).

As MDE explains in its brief, it "interpreted this language to allow, but not require, it to award site rehabilitation costs for remedial activities not falling within the remedial categories listed in section .05A." It further asserts that if § .05B "were used to pay site rehabilitation costs in amounts exceeding the limits imposed by section .05A, it would render section .05A a nullity." We agree, and find this reasoning not only very persuasive, but succinctly on point and dispositive in this case. *See Wright,* 348 Md. at 216, 703 A.2d 150 ("Of course, we seek to avoid an interpretation which would lead to an untenable or illogical outcome.") (citations omitted).

## CONCLUSION

We find that the court properly granted appellee's motion for summary judgment. We therefore affirm the judgment of the Circuit Court for Montgomery County in this matter.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**